# Exhibit 1

Westlaw.

Not Reported in F.Supp.2d                                            Page 1
Not Reported in F.Supp.2d, 2004 WL 816770 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S. Gypsum Co. v. Lafarge North America, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
UNITED STATES GYPSUM COMPANY,
Plaintiff, Counterdefendant,
v.
LAFARGE NORTH AMERICA, INC., Defendant,
Counterplaintiff.
**No. 03 C 6027.**

March 2, 2004.

Bruce Michael Gagala, H. Michael Hartmann, Mark
E. Phelps, Paul J. Filbin, Leydig, Voit & Mayer,
Ltd., Chicago, IL, Salim Arif Hasan, Leydig, Voit
& Mayer, Chicago, IL, for Plaintiff/
Counter-Defendant.
John W. Treece, Richard J. O'Brien, Paul E. Veith,
Sidley Austin Brown & Wood LLP., Chicago, IL,
Richard Jerold Hoskins, Stacie Rachel Hartman,
Jamison E. Lynch, Schiff Hardin LLP., Chicago,
IL, Robert DeVos, Bruce T. Weider, Burns, Doane,
Swecker & Mathis, Alexandria, VA, for Defendant/
Counter-Claimant.

*MEMORANDUM OPINION AND ORDER*
HART, J.
**\*1** Plaintiff United States Gypsum Company
("USG") alleges that defendant Lafarge North
America, Inc. ("Lafarge") has infringed a patent of
USG relating to a method for manufacturing
gypsum wallboard. The patent is entitled "Method
For Preparing Uniformly Foamed Gypsum Product
with Less Foam Agitation."Lafarge has counter-
claimed for a declaration that the patent is not in-
fringed and/or is unenforceable. Presently pending
is a discovery dispute. As an expert, Lafarge has re-
tained Robert Bruce, Ph.D., whom the parties agree
is a highly qualified person in the field. USG,
however, objects to Lafarge's use of Bruce because
he is a consultant for many of the leading manufac-
turers of gypsum wallboard, but not USG. Manu-

facturers for whom Bruce is a consultant include
many of the principal competitors of USG. USG ar-
gues that, regardless of any promises contained in a
protective order that Bruce would agree to follow in
good faith, Bruce's access to USG's confidential in-
formation would unfairly result in Bruce using
some or all of that information when advising his
consulting clients. USG argues that Lafarge should
be required to retain other qualified experts that are
available.

Resolution of the pending motion requires that the
interests involved be balanced. The risk that USG
will suffer an unfair competitive disadvantage must
be weighed against the burden on Lafarge of having
to retain a different expert. *SeeTelular Corp. v.
Vox2, Inc.,* 2001 WL 641188 \*1 (N.D.Ill. June 4,
2001); *Rice v. United States,* 39 Fed. Cl. 747,
751-52 (1997); *Advanced Semiconductor Materials
America Inc. v. Applied Materials Inc.,* 43
U.S.P.Q.2d 1381 (N.D.Cal.1996). The burden is on
USG to show the type of confidential information
that will need to be disclosed to Lafarge's expert,
that this information will be useful to USG's com-
petitors, and that Lafarge's expert is in a position
that could allow the information to be used by com-
petitors. *SeeTelular,* 2001 WL 641188 at \*2;*Ad-
vanced Semiconductor,* 43 U.S.P.Q.2d at
1384;*Topps Co. v. Productos Stani Sociedad Anom-
ina Industrial y Commercial,* 2001 WL 406193 \*1
(S.D.N.Y. April 20, 2001). The burden is on La-
farge to show that there are not other experts avail-
able or that those who are available will be less use-
ful than Bruce. *SeeTelular,* 2001 WL 641188 at
\*3;*Rice,* 39 Fed. Cl. at 752.

There is no dispute that Bruce is currently a con-
sultant to all or most of USG's major competitors.
Although a person may, in good faith, attempt to
segregate knowledge learned in confidentiality dur-
ing litigation, it would be difficult for a person in
Bruce's position to segregate any knowledge gained
in this case from future analyses provided in his
role as a consultant. *SeeLitton Industries, Inc. v.
Chesapeake & Ohio Ry.,* 129 F.R.D. 528, 531

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 816770 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

(E.D.Wis.1990); *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.,* 682 F.Supp. 20, 22 (D.Del.1988); *Rice,* 39 Fed. Cl. at 751. This situation is distinguished from those in which the expert is no longer an active consultant or has not consulted for a competitor in a number of years. See*Telular,* 2001 WL 641188 at *2;*Advanced Semiconductor,* 43 U.S.P.Q.2d at 1383.On the pleadings before the court, it can only be concluded that Bruce is in a position where confidential information he may receive would have a significant likelihood of eventually inuring to the benefit of competitors of USG.

**\*2** To meet its burden, USG must also show that the expert to be retained by Lafarge will have access to confidential information that would be useful to competitors. In its motion, Lafarge requests that Bruce be granted access to USG-designated protected information, including, *but not limited to,* accompanying Lafarge attorneys on their inspections of USG manufacturing facilities. In its briefs, Lafarge focuses on inspecting an existing mixer of USG that is in use and incorporates the method set forth in the patent at issue. USG focuses on the "not limited to" nature of the request and contends that Lafarge's expert would be given access to all protected information.

In light of its understanding of information that may be made available to a Lafarge expert, USG provides the affidavit of William White, its Director of Technical Services for Gypsum and Ceilings. It is understandable that USG would leave certain specifics out of the affidavit which is part of the public record in this case. White's affidavit, however, is lacking in specificity and entirely conclusory. He states:
A tour of USG's gypsum wallboard manufacturing facilities, or parts of them, by a person knowledgeable about gypsum wallboard manufacturing operations, such as Dr. Bruce, would expose that person to a large amount of technically significant and commercially-sensitive information that is proprietary to USG. By way of example, such information includes engineering and operating details unrelated to the subject matter of the patent in suit and in-

formation on the operating speed, product mix, capacity, formulation, staffing and trade secret process techniques unique to USG.

White Aff. ¶ 3. As to documents that may be disclosed in discovery, he states that it will include the same type of information plus "identification of ingredients and recipes, identification of suppliers and customers, as well as information on costs, profitability, efficiencies and troubleshooting techniques."*Id.* ¶ 4. It is stated that deposition testimony would also disclose such information. *Id.* ¶ 5.

Lafarge's representations regarding alternative experts is also conclusory. It is contended that Lafarge has not been in the wallboard business for very long and has no retired employees who would be available to fill the expert role.[FN1] It is represented that:

> FN1. USG questions this representation. USG contends that affiliated corporations related to Lafarge have been in the wallboard business for a number of years and there is no representation that retired employees of those companies have been considered.

Lafarge counsel expended considerable effort to locate individuals well acquainted with the gypsum wallboard making process. Some candidates contacted chose not to participate. Others contacted did not have Dr. Bruce's depth of knowledge of gypsum wallboard manufacturing. Dr. Bruce's long tenure in the gypsum wallboard manufacturing industry coupled with his successful consulting practice make him the ideal expert to analyze and inform the Court and Lafarge of the gypsum wallboard process technology at issue in this case.
... As a result of its search, Lafarge has located a university professor well qualified in areas related to fluid dynamics, who will be helpful in understanding and explaining certain aspects of the wallboard making process.

**\*3** Lafarge Reply at 8-9.[FN2]

> FN2. These representations are not suppor-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 816770 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ted by an affidavit. Lafarge offers to provide a more detailed disclosure *in camera,* but there would certainly be more details that could have been publicly disclosed and Lafarge could have at least supported its summary description with an affidavit.

Balancing the interests involved is difficult in light of the limited presentations made by the parties. It appears possible that disclosure of certain information to Bruce could be prejudicial to USG, but it is unclear which such information or whether that information is part of what Lafarge intends to make available to Bruce. It would seem that specific information about formulae, ingredients, and recipes would be the type of information that would cause concern if disclosed to Bruce, but it is not at all clear that such information is relevant to the method patent at issue. It would also seem that financial and customer information that may be disclosed because possibly relevant to the issue of damages is not the type of information that need be provided to a technical expert such as Bruce. USG's presentation is insufficient to show that, allowing Bruce to inspect particular USG equipment that uses methods disclosed in the patent, will result in the disclosure of confidential information that would potentially be advantageous to competitors if subsequently considered by Bruce when consulting with USG competitors.

On the presentation before the court, the narrow issue expressly raised by Lafarge's motion is all that will be decided. Since there is no adequate showing that an inspection of specific equipment is sufficiently likely to cause harm to USG, USG will be required to permit Bruce to inspect such equipment. USG shall permit Bruce to accompany Lafarge attorneys when inspecting the mixer at USG's Southard, Oklahoma facility.[FN3] Whether Bruce is permitted access to any other confidential discovery is presently left for the parties to attempt to resolve in light of today's ruling.

FN3. This mixer is referenced in a December 24, 2003 letter from USG attorney

Bruce Gagala. *See* Lafarge Reply Exh. G.

Before the parties again bring this issue before the court, they must make a good faith effort to resolve this dispute by agreement. That would include actual consideration of whether specific confidential information is likely to be useful to competitors if disclosed to Bruce. USG apparently is already prepared to make document disclosures to plaintiff, including confidential documents. USG should inform Lafarge's attorneys as to which confidential documents it contends should not be disclosed to Bruce. USG (and Lafarge as well) should keep in mind that it should not overuse its designation of documents as confidential. Although the parties may designate certain discovery as confidential, should this case reach the stage of summary judgment or trial, much of that material will nevertheless become public. This court will not necessarily agree with the parties' designations of confidential materials and will only permit the filing of summary judgment materials outside the public record if truly justified. *SeeCitizens First National Bank of Princeton v. Cincinnati Insurance Co., 178 F.3d 943 (7th Cir.1999); Sasu v. Yoshimura, 147 F.R.D. 173 (N.D.Ill.1993).* Since such materials would otherwise become part of the public record, they are not the type of materials that could be withheld from Bruce. As to Lafarge, it must give serious consideration to whether there are other available experts. Lafarge would also have to consider whether Bruce would be used along with other experts and, if so, what confidential information Lafarge would want to be available for Bruce's analysis. Moreover, the parties must candidly disclose to each other their views on the above matters. It is expected that the parties will be able to resolve this matter without the need of further assistance from the court.

*4 IT IS THEREFORE ORDERED that defendant Lafarge's motion to permit disclosure of protected information to Robert Bruce under the agreed protective order [22-1] is granted in part and denied in part. Plaintiff USG shall permit Robert Bruce to accompany Lafarge's attorneys on any inspections of a mixer at USG's Southard, Oklahoma plant. A

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 816770 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

status hearing will be held on March 24, 2004 at
11:00 a.m.

N.D.Ill.,2004.
U.S. Gypsum Co. v. Lafarge North America, Inc.
Not Reported in F.Supp.2d, 2004 WL 816770
(N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 2

Westlaw.



43 U.S.P.Q.2d 1381
1996 WL 908654 (N.D.Cal.), 43 U.S.P.Q.2d 1381
(Cite as: 43 U.S.P.Q.2d 1381)

Page 1

Advanced Semiconductor Materials America Inc.

v.

Applied Materials Inc.

U.S. District Court Northern District of California

No. 95-20169 RMW (EAI)

Decided October 28, 1996
United States Patents Quarterly Headnotes

**JUDICIAL PRACTICE AND PROCEDURE**
**[1] Procedure -- Evidence -- Expert testimony**
**(Section 410.3703)**
Patent infringement plaintiff's motion for order permitting its designated expert witness access to defendant's confidential information is granted, since expert in question appears to possess qualifications that plaintiff's other experts do not, since highly technical nature of case makes expert testimony crucial to understanding of plaintiff's claims, since access to defendant's highly confidential information is necessary in order for plaintiff's experts to effectively testify regarding those claims, since plaintiff must be permitted to present experts it believes can convey highly technical information to lay persons, and since defendant has not shown "reasonable likelihood" that designated expert, who does not currently have relationship with defendant's competitor, will misuse defendant's confidential information.

**\*1382** Action by Advanced Semiconductor Materials America Inc. against Applied Materials Inc. for patent infringement. On plaintiff's motion pursuant to Local Rule 7-10 for order permitting its designated expert witness access to information designated by defendant as "Confidential -- Attorneys' Eyes Only." Granted.

Related decision: 30 USPQ2d 1553 .

Don W. Martens, John B. Sganga Jr., Stephen C. Jensen, Vito A. Canuso III, Stephen S. Korniczky, and Ann A. Byn, of Knobbe, Martens, Olson & Bear, Newport Beach, Calif.; Richard J. Gray and

Mark E. Waite, of Bergeson, Eliopoulos, Grady & Gray, San Jose, Calif., for plaintiff.

Matthew D. Powers, Edward R. Reines, and Steven S. Cherensky, of Weil, Gotshal & Manges, Menlo Park, Calif., for Applied Materials Inc.

Infante, U.S. magistrate judge.

## I. INTRODUCTION

Advanced Semiconductor Materials America, Inc. ("ASMA") moves under Local Rule 7-10 for an order permitting ASMA's designated expert witness Dr. Arthur Sherman access to certain information designated by Applied Materials, Inc. ("Applied") as "Confidential -- Attorneys' Eyes Only." In accordance with the Revised Second Amended Protective Order, dated September 3, 1996 ("the Protective Order"), ASMA provided Applied with 10 days' notice of its intention to show Dr. Sherman confidential material. Applied objected to Dr. Sherman having access to such material because Dr. Sherman has consulted in the past for Novellus Systems, Inc. ("Novellus"), a competitor of Applied, and is not barred from doing so again in the future.

## II. BACKGROUND

ASMA has designated Dr. Sherman as an expert witness in this action who may testify regarding (1) the level of skill in the art; (2) the understanding of one of ordinary skill in the art of certain claim terms in the patent-in-suit; (3) reading the claims of the patent-in-suit on the accused Applied chemical vapor deposition ("CVD") reactors; (4) analysis of the accused Applied CVD reactors; and (5) the equivalence of the accused apparatus and the claimed apparatus. *See* Declaration of Steven S. Cherensky in Opposition to ASMA's Motion ("Cherensky Decl.") at Ex. A [ASMA's Designation of Expert Witnesses]. The confidential information which ASMA wishes to show Dr. Sherman relates to gas flow and gas flow modelling in the accused Applied CVD reactors, including drawings, lab notebooks, manuals and process recipes. *See* Ap-

COPR. © 2007 The Bureau of National Affairs, Inc.

43 U.S.P.Q.2d 1381

Page 2

1996 WL 908654 (N.D.Cal.), 43 U.S.P.Q.2d 1381

(Cite as: 43 U.S.P.Q.2d 1381)

plied's Opp. at 2.

Dr. Sherman's curriculum vitae reflects that Dr. Sherman has worked in the CVD field since at least 1981. [FN1] He currently is President of Sherman & Associates, Inc. and consults in the CVD field. Dr. Sherman's educational background includes a Master's degree from Princeton University and a Ph.D from the University of Pennsylvania. He also has extensive teaching experience and publications, including a book and numerous papers on CVD. *See* Byun Decl. at Ex. 6. Dr. Sherman consulted for Novellus four years ago regarding gas flow modelling. *See* Declaration of Dr. Arthur Sherman in Support of ASMA's Motion ("Sherman Decl.") at Paragraphs 2-3. [FN2] In addition, ASMA acknowledges that, "more recently," Dr. Sherman developed a wafer handling device, funded in part by Novellus. *See* ASMA's *1383 Motion at 2. [FN3] Although Novellus purchased several prototypes of the device (the last prototype being delivered in March 1996), and has an option for one-year exclusivity on the product, Novellus has indicated to Dr. Sherman that it has no plans to adopt the product. *See* Sherman Decl. at Para. 3. Presently, Dr. Sherman has no relationship with Novellus.See, Sherman Decl. at Para. 4.

### III. DISCUSSION

#### A. ASMA's Motion

ASMA asserts that, to prove patent infringement by Applied, it must present expert testimony regarding gas flow modelling within Applied's reactor. ASMA has designated two experts, in addition to Dr. Sherman, with extensive gas flow modelling background. However, ASMA states that:

Dr Sherman adds extensive CVD experience in interpreting the results of models in the context of the operation of a CVD reactor. Dr. Sherman has CVD experience, modelling experience, as well as extensive experience as an author and lecturer in the CVD field. Dr. Sherman is thus uniquely qualified to testify about both validity and infringement.

*See* ASMA's Motion at 3.

ASMA states that Dr. Sherman has agreed to be bound by the Protective Order, and contends that Applied's refusal to consent to Dr. Sherman because he has worked for Novellus, an Applied competitor, in the past, and is not restricted from doing so again, is not a sufficient basis for denying Dr. Sherman access to the information. *See* ASMA's Motion at 3. ASMA contends that, under the terms of the Protective Order, Applied must show that there is a "reasonable likelihood" that Dr. Sherman will misuse the information and that Applied has not done so here. *See* Declaration of Ann. A. Byun in Support of ASMA's Motion ("Byun Dec.") at Ex. 1 [Protective Order], Para. 9(b).

ASMA acknowledges that, in another lawsuit between Novellus and Applied, Judge Legge denied Dr. Sherman access to Applied's "Attorneys' Eyes Only" information without prejudice to Novellus showing that Dr. Sherman had expertise that Novellus' other experts did not have. *See* ASMA's Motion at 4. ASMA contends here that Dr. Sherman possesses qualifications that its other experts do not have. In addition, ASMA offers to remove an expert from its designation (Dr. Flamm), who has not seen confidential information, in order to minimize the number of experts to whom disclosure of sensitive information is made. *See* ASMA's Motion at 5. ASMA also agrees not to show Dr. Sherman any confidential documents relating to wafer handling, which was the subject of Dr. Sherman's most recent involvement with Novellus.

#### B. Applied's Opposition

In its opposition to ASMA's motion, Applied objects to Dr. Sherman having access to Applied's "Confidential -- Attorneys' Eyes Only" information in this action because Dr. Sherman has consulted for Novellus in the past and will not agree not to consult with Novellus in the future. Applied does not contend that Dr. Sherman will deliberately misuse confidential information shown to him; rather, it states that:

if Dr. Sherman consults for a competitor of Applied Materials, such as Novellus, regarding gas flow

43 U.S.P.Q.2d 1381
1996 WL 908654 (N.D.Cal.), 43 U.S.P.Q.2d 1381
(Cite as: 43 U.S.P.Q.2d 1381)

Page 3

modelling or showerhead design or other aspects of CVD reactor technology, as he apparently intends to do, it would be virtually impossible for Dr. Sherman *not* to use the Applied Materials Confidential Information ASMA wants to give Dr. Sherman.

*See* Applied's Opp. at 3. [FN4]

Applied further contends that Dr. Sherman's proposed testimony is duplicative of other experts designated by ASMA (Drs. Clark and Mountiaris) and, therefore, creates an unnecessary risk of injury to Applied. *See* Applied's Opp. at 4. In support of this position, Applied points to Judge Legge's order in the Novellus litigation denying Dr. Sherman access to highly confidential information subject to a showing by Novellus that Dr. Sherman possessed expertise which other designated experts did not possess.

C. Analysis

Applied's objection to Dr. Sherman is that, if Dr. Sherman is given access to Applied's confidential information, he will inevitably misuse that information if he consults for Applied's competitors in the future because the information will be in his head. *1384 However, this cannot be the standard to be applied. If it was, then a litigant could successfully object to any active industry consultant in any high technology litigation, thereby giving it the power of veto over its adversary's choice of experts. Rather, the court must balance ASMA's interest in electing the experts most beneficial to its case with Applied's interest in protecting its trade secrets from disclosure to competitors.

Given Dr. Sherman's extensive credentials in the CVD industry, and extensive experience teaching and lecturing, it appears that Dr. Sherman possesses qualifications to be an expert witness in this case which ASMA's other designated experts may not possess. Because of the highly technical nature of this case, expert testimony will be crucial to an understanding of ASMA's claims. Access to Applied's highly confidential information is necessary in order for ASMA's experts to effectively testify regarding those claims. Therefore, absent compelling

reasons urging the contrary, ASMA must be permitted to present the experts who it believes possess the ability to convey highly technical information to lay persons, and those experts must be permitted access to Applied's confidential information.

[1] ASMA correctly points out that, under the current Protective Order, a party may object to the disclosure of confidential information to a consultant if "there is a reasonable likelihood that the designated person may use [the] information . . . for purposes other than the preparation or trial of this case."*See* Byun Decl. at Ex. 1 [Protective Order], Para. 9(b). Applied has not shown a "reasonable likelihood" that Dr. Sherman will misuse confidential information. Essentially, it is seeking a new Protective Order from the court that alters this standard. The court is not insensitive to Applied's concerns regarding the risk to its confidential information. However, Applied has not carried its burden of showing that good cause exists for this court to deny Dr. Sherman access to the documents at issue. *See Blankenship v. Hearst Corp.*, 519 F.2d 418, 426 (9th Cir. 1975) (party seeking protective order bears burden of showing good cause therefor). Dr. Sherman last consulted for Novellus regarding gas flow modelling 4 years ago. Dr. Sherman has no current relationship with Novellus regarding gas flow modelling or the processes for deposition of materials onto silicon wafers. Therefore, Applied's objection to Dr. Sherman appears to boil down to the fear that, because it is likely that Dr. Sherman will consult in the CVD industry in the future, he will innocently misuse Applied's information. This fear, without more, is not sufficient to substantiate a risk of competitive injury to Applied that outweighs ASMA's need for Dr. Sherman's services as an expert witness in this case.

Dr. Sherman has agreed to be bound by the Protective Order. Applied must look to the Protective Order and to the laws against theft of trade secrets for its protection. Applied's objections under Para. 9(b) of the Protective Order are, therefore, overruled.

IV. CONCLUSION

COPR. © 2007 The Bureau of National Affairs, Inc.

43 U.S.P.Q.2d 1381
1996 WL 908654 (N.D.Cal.), 43 U.S.P.Q.2d 1381
**(Cite as: 43 U.S.P.Q.2d 1381)**

Page 4

ASMA's Motion seeking to have Dr. Sherman approved as a consultant having access to "Confidential -- Attorneys' Eyes Only" information under the Protective Order is GRANTED subject to the following conditions: (1) Dr. Sherman shall comply with all the provisions of the Protective Order, including paragraph 11, which provides that confidential information shall be kept in secure facilities at trial counsel's offices; (2) Dr. Sherman shall not have access to confidential documents relating to wafer handling (which was the subject of his most recent relationship with Novellus); (3) ASMA shall remove Dr. Flamm from its designation of experts in order to reduce the number of consultants with access to Applied's information; and (4) at the close of the trial of this action, Dr. Sherman shall return to ASMA's counsel *all* documents, notes, or other tangible materials relating to his review of Applied's confidential information.

IT IS SO ORDERED.

> FN1 In fact, Dr. Sherman was employed with Applied from 1981 to 1984 as a "Senior Scientist -- CVD Systems. "*See* Declaration of Ann A. Byun in Support of ASMA's Motion ("Byun Decl.") at Ex. 6.

> FN2 The patent in suit relates to a chemical vapor deposition reactor which creates a desired gas flow pattern over a semiconductor wafer. *See* ASMA's Motion at 2.

> FN3 The patent in suit does not relate to a wafer handling device. *See* ASMA's Motion at 2.

> FN4 Applied also contends that Dr. Sherman's agreement not to consult with Novellus on showerhead design for six months after trial is not sufficient to protect Applied's interests. *See* Applied's Opp. at 3.

N.D.Cal.

43 U.S.P.Q.2d 1381

END OF DOCUMENT

COPR. © 2007 The Bureau of National Affairs, Inc.

Exhibit 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Telular Corp. v. Vox2, Inc.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
TELULAR CORPORATION, Plaintiff,
v.
VOX2, INC. Defendant.
No. 00 C 6144.

June 4, 2001.

MEMORANDUM OPINION AND ORDER

NOLAN, Magistrate J.

*1 This is a patent infringement action brought by Telular Corporation ("Telular") against Vox2, Inc. ("Vox2"). The '096 patent at issue relates to an interface device that allows standard telephones to control the operation of a cellular transceiver. This matter is before the Court on Telular's Motion for Expedited Determination of Expert. Telular requests that the Court enter an order granting its expert, Kevin O' Brien ("O'Brien"), access to material designated "Confidential" and "Confidential-Attorneys' Only" under the protective order entered in this case. Vox2 objects to O'Brien having access to such material because it believes that O'Brien cannot avoid using the confidential information he will learn from his work as an expert in this case in his current job.

ANALYSIS

Telular and Vox2 executed a protective order governing disclosure of confidential information obtained in discovery. Paragraphs 4(c) and 5(b) of the protective order provide that confidential information may be provided to experts who are independent of and not employed by the parties or a competitor of either party in the field to which the subject matter of this action pertains and who are retained for purposes of this action. Thus, when determining whether to allow O'Brien access to Vox2's confidential information, the Court must balance Telular's interest in selecting the expert most beneficial to its

case with Vox2's interest in protecting its trade secrets from disclosure to its competitors. *Advanced Semiconductor Materials America Inc. v. Applied Materials Inc.*, 43 U.S.P.Q.2d 1381, 1384 (N.D.Cal.1996).

O'Brien has a bachelor's degree in electrical engineering (B.S.E.E.) from Villanova University. O'Brien is currently the Director of Sales for Digi-Tel Communications, LLC ("Digi-Tel"). Digi-Tel sells cellular telephones, cellular telephone accessory products, and cellular telephone network service plans. As Director of Sales for Digi-Tel, O'Brien manages all sales efforts of the company as well as develops indirect market channels for wireless products, landline telephone equipment, and satellite TV equipment. O'Brien is also involved in developing Digi-Tel's business-to-business Internet based sales channel and opening new distribution locations. O'Brien has been Director of Sales for Digi-Tel since 1997.

Vox2 argues that it is inevitable that O'Brien will misuse Vox2's confidential information in his position as Sales Director of Digi-Tel. The cases relied on by Vox2 in support of its inevitable disclosure argument are easily distinguishable from the present circumstances. For example, in *Pepsico, Inc. v. William E. Redmond, Jr.*, 54 F.3d 1262 (7th Cir.1995), Pepsico sought a preliminary injunction preventing a former Pepsico employee, Redmond, from assuming his duties at Quaker, a fierce competitor of Pepsico's in the beverage-industry. While employed at Pepsico, Redmond held a relatively high-level position and had access to inside information and trade secrets. Pepsico presented substantial evidence that Redmond possessed extensive and intimate knowledge about Pepsi-Cola North America division's ("PCNA") strategic goals in sports drinks and new age drinks. The district court concluded that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of PCNA trade secrets." *Id.* at 1269. The district court also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

concluded that Redmond's lack of forthrightness on several occasions before accepting his job with Quaker and in his testimony before the district court demonstrated that he could not be trusted to protect Pepsico's trade secrets. The Seventh Circuit upheld the district court's order enjoining Redmond from assuming his duties at Quaker and preventing him from forever disclosing PCNA trade secrets and confidential information.

*2 Vox2 has not demonstrated that O'Brien will inevitably use Vox2 trade secrets in the performance of his job as Sales Director for Digi-Tel. Digi-Tel is not a competitor of Vox2 unlike Pepsico's direct competition with Quaker. Vox2 is the developer and manufacturer of the Vox.Link, a cellular accessory product, which it markets through distributors. Digi-Tel distributes cellular telephones and cellular accessories manufactured by various companies and sells the services of companies that provide cellular service plans. Digi-Tel does not develop or manufacture cellphone accessories and does not sell the Vox.Link or any cellphone interface. Vox2 asserts that a danger exists that Digi-Tel may sell a cellular interface that competes with the Vox.Link in the future and then O'Brien would be working for a competitor of Vox2. Vox2's fear that Digi-Tel may possibly sell a competitor's cellular interface at some time in the future does not outweigh Telular's right to utilize the expert of its choice. Furthermore, unlike Redmond's lack of forthrightness in the *Pepsico* case which led the district court to believe a real threat of trade secret disclosure existed, the Court has no reason to question O'Brien's candor in agreeing to be bound by the protective order and to only use confidential material disclosed to him in the present litigation.

In *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc .,* 682 F.Supp. 20 (D.Del.1988), another case cited by Vox2, the plaintiff requested that its president, Mr. Greene, be allowed access to the defendant's confidential information. The plaintiff and defendant corporations were direct competitors in the market for avionics equipment. The court described Greene as a preeminent aeronautic engineer who had received more than sixty aeronautic pat-

ents. Green actively plied aeronautic engineering. The district court precluded Greene from reviewing defendant's confidential documents because it believed he would be unable to separate the information he learned from defendant's documents from his own ideas.

*Safe Flight Instrument Corp.* is also distinguishable from the instant case. There is significantly less risk of disclosure of confidential information by O'Brien because he is not actively working or consulting as an electrical engineer in the telecommunications industry. Unlike Greene in *Safe Flight Instrument Corp.,* O'Brien is not the president of a competing company who is currently doing research in the relevant technical area. Rather, O'Brien is the sales director of a company that does not compete with Vox2 or its distributors. O'Brien is not employed as an electrical engineer and is no longer active in design and analysis of radio communications systems. Given Vox2's failure to show how its confidential information is applicable to O'Brien's job as sales director of a company that does not compete with Vox2 and its failure to demonstrate that O'Brien will inevitably misuse confidential information gained during this litigation in his job as sales director, the Court finds Vox2's case authority and inevitable disclosure argument unpersuasive.

*3 The Court must also consider Telular's need for this particular expert. Telular asserts that O'Brien is indispensable to Telular's presentation of its case. O'Brien explains in paragraph 8 of his declaration that he has been a testifying expert in other patent litigations involving the '096 patent at issue in this litigation or its continuation patents. *See DNIC Brokerage v. Morrison & Dempsey Communications, Serrano v. Telular Corporation,* and *Alliance Corporation v. Telular Corporation.* Vox2 correctly points out that Telular fails to provide an affidavit from O'Brien or other evidence supporting Telular's further assertions regarding O'Brien. Because the Court finds that the likelihood of harm occurring to Vox2 as a result of disclosure of confidential information to O'Brien is minimal, Telular's failure to support its argument that O'Brien is uniquely qualified to serve as an expert in this case with addition-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

al evidence does not tip the scale in favor of deny-ing Telular the right to use its chosen expert.

Vox2 argues that O'Brien's relationship with AT & T and others is a separate and independent basis for prohibiting the disclosure of Vox2's confidential in-formation to him. Vox2 claims that it had a grow-ing business relationship with AT & T until Telular intervened by sending a letter to AT & T that con-tained numerous material false statements. Vox2 is preparing or has filed unfair competition and tor-tious interference counterclaims against Telular based on its actions with respect to AT & T. Vox2 maintains that its business relationship with AT & T will be directly at issue in its counterclaims. Digi-Tel is a distributor of AT & T wireless products and services. Digi-Tel sells a variety of cellular phones that are activated and placed in ser-vice on the AT & T wireless network. O'Brien de-clares that he has never had direct contact with AT & T except as is required to activate a phone with cellular service and that his contact is limited to AT & T's customer service representatives. O'Brien has also received e-mails from the AT & T indirect channel marketing department.

According to Vox2, a conflict exists because O'Brien will presumably assist Telular in defending against the counterclaims and at the same time con-tinue his business relationship with AT & T. Vox2 fails to explain how O'Brien's limited relationship with AT & T and Telular's conduct with respect to Vox2's relationship with AT & T create a conflict which provides a valid basis for disqualifying O'Brien as an expert. Moreover, AT & T is not a competitor of Telular or Vox2. Thus, by distribut-ing AT & T products and services, O'Brien is not employed by a competitor of either party.

Finally, Vox2 faults O'Brien for failing to state with certainty that he will not in the near future compete directly with Vox2. Vox2 has not demonstrated that there is a substantial likelihood that O'Brien will be competing with Vox2 in the near future. Vox2's un-substantiated fear that O'Brien may compete with Vox2 in the future is not sufficient to demonstrate a risk of competitive injury to Vox2 that outweighs

Telular's right to the expert of its choice.

CONCLUSION

*4 Because O'Brien is not employed by either of the parties or a competitor of either of the parties in the field to which the subject matter of this action pertains and the likelihood of disclosure of Vox2's confidential information to its competitors should O'Brien be allowed access to the materials is min-imal, Telular's Motion for Expedited Determination of Expert is GRANTED. O'Brien will be allowed access to materials designated "Confidential" or "Confidential-Attorneys' Only" under the protective order in this case with the exception of Vox2's mar-keting and distribution channel information. O'Brien will be bound by the protective order entered in this case and will be subject to the con-tempt should he violate this order. The confidential materials disclosed to O'Brien will only be used for purposes of this litigation and for no other pur-poses.

N.D.Ill.,2001.
Telular Corp. v. Vox2, Inc.
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4

Westlaw.

238 F.R.D. 544

238 F.R.D. 544

**(Cite as: 238 F.R.D. 544)**

Page 1

Nellson Northern Operating, Inc. v. Elan Nutrition, LLC
D.Vt.,2006.

United States District Court,D. Vermont.
NELLSON NORTHERN OPERATING, INC.,
Plaintiff,
v.
ELAN NUTRITION, LLC and Elan Nutrition, Inc.,
Defendants.
**No. 2:02-CV-0304.**

Dec. 4, 2006.

**Background:** Defendant in patent infringement suit moved for leave to disclose patentee's confidential information to defendant's expert.

**Holding:** The District Court, Sessions, Chief District Judge, held that defendant would be permitted to share report of patentee's expert with its expert, notwithstanding patentee's objection that its proprietary information could reach its competitors through defendant's expert who had previously worked for suppliers to competitors of patentee.

Motion granted.
West Headnotes
**[1] Federal Civil Procedure 170A ☞1272.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1272.1 k. In General. Most Cited Cases
To resolve a dispute over disclosure of confidential information to experts, courts balance the movant's interest in selecting the consultant most beneficial to the case, considering the specific expertise of this consultant and whether other consultants possess similar expertise, against the disclosing party's interest in protecting confidential commercial information from disclosure to competitors.

**[2] Patents 291 ☞292.4**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k292 Discovery
                291k292.4 k. Other Matters. Most Cited Cases
Defendant in patent infringement suit would be permitted to share report of patentee's expert with its expert, notwithstanding patentee's objection that its proprietary information could reach its competitors through defendant's expert who had previously worked for suppliers to competitors of patentee; risk that patentee's confidential information would be disclosed by defendant's expert was not great, and defendant's strong interest in selecting expert of its choice outweighed patentee's interest in nondisclosure.

**\*544** Andrew R. Strauss, Andrew D. Manitsky, Gravel and Shea, Burlington, VT, Timur E. Slonim, John M. Delehanty, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., New York, NY, for Plaintiff.
Lisa R. Harris, Randall G. Litton, Steven L. Underwood, Todd A. Van Thomme, Price, Heneveld, Cooper, Dewitt & Litton, LLP, Grand Rapids, MI, Thomas Z. Carlson, Alison J. Bell, Langrock Sperry & Wool, LLP, Burlington, VT, for Defendants.

**\*545 MEMORANDUM AND ORDER**
SESSIONS, Chief Judge.
Before the Court is a Motion by Defendants Elan Nutrition, LLC and Elan Nutrition, Inc. ("Elan") seeking leave to disclose the Plaintiff's confidential information to Elan's expert, Ann Grev. Plaintiff Nellson Northern Operating, Inc. ("Nellson") opposes the disclosure on the grounds that its proprietary information could reach its competitors through Grev. For the reasons set forth below, Elan's Motion for Leave to Disclose Confidential Information (Doc. 87) is GRANTED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## I. BACKGROUND

Both Elan and Nellson manufacture nutrition bars. Nellson is the holder of U.S. Patent No. 6,299,929 (the "'929 Patent") and U.S. Patent No. 6,749,886 B2 (the "'886 Patent"). In this suit, Nellson alleges that Elan has infringed both patents in violation of the patent laws of the United States, particularly 35 U.S.C. §§ 271 and 281. Elan denies infringing the patents, and further asserts that the patents are invalid in view of prior art predating the filing of applications for these patents and in view of "basic deficiencies" in the patents and in the way that the patents were "filed, prosecuted, and/or examined in the U.S. Patent Office." (First Am. Answer to Compl. ¶ 30 (Doc. 62).)

On September 3, 2003, the Court (Murtha, J.) entered a Protective Order and Stipulation of Confidentiality. It states that the parties shall designate information subject to discovery as "confidential" or "confidential-attorneys' eyes only." Information so designated is subject to a number of restrictions. With respect to disclosures to experts, paragraphs 5 and 7 state that information designated as "confidential" or "confidential-attorneys' eyes only" may be disclosed to "any person not affiliated with a Party who is specifically retained by an attorney ... to assist in the preparation of this action for trial as a consultant or testimonial expert." This disclosure is subject to several limitations. First, disclosure can be made "only to the extent reasonably necessary for purposes of this action." Second, the expert must agree to be bound by the terms of the Protective Order, and must sign an Acknowledgment to that effect. Finally, paragraph 8 of the order establishes that before disclosing any protected information, the receiving party must notify the producing party of its intent. The producing party then has five business days to object to the disclosure. If an objection is made, the information shall not be disclosed until the issue is resolved, either by agreement between the parties or by court order.

Elan shared Nellson's confidential information with a technical expert, Dr. Wayne Moore, Ph.D., with Nellson's acquiescence. Dr. Moore submitted expert reports in this case on January 19, 2004, and August 29, 2006. On July 7, 2006, Elan advised Nellson of its intention to share the information with a second technical expert, Ms. Ann Grev. Nellson informed Elan that it was objecting to disclosure of confidential information to Grev, based on her past work for The Solae Company ("Solae"), a supplier to competitors of Nellson, and her current work for Cargill, Inc. ("Cargill") another protein supplier. Grev completed an expert report based on Nellson's patent applications, without the benefit of any confidential information, on August 24, 2006.

Nellson retained Dr. Gregory Ziegler as an expert. Dr. Ziegler completed a report on August 28, 2006, which is designated as "confidential-attorneys' eyes only."

On September 8, 2006, Elan filed the present Motion seeking the Court's permission to disclose Nellson's confidential information to Grev. The Court held a hearing on the Motion on October 18, 2006. During that hearing, Elan's counsel agreed to limit the scope of its disclosures to Grev, requesting that she have access merely to the report of Nellson's expert witness Dr. Gregory Ziegler and accompanying exhibits, and to Dr. Ziegler's report responding to Grev's report. The Court ruled that Nellson could depose Grev regarding her current professional activities in order to determine whether or not those activities would be likely to lead to her deliberate or inadvertent disclosure of Nellson's confidential information. The deposition was held on November 2, 2006. The parties subsequently*546 filed supplemental memoranda on this issue.

### A. Grev's Background

Grev worked for Solae and its predecessor companies from 1974 until 2005. Solae manufactures soy products which it supplies to other companies for use in food products. (Grev Dep. 9:14-17, Nov. 2, 2006 (Doc. 126 Ex. A).) Grev's work there was primarily on the Ralston Purina protein PP-860, which the company developed for use in food bars.FN1 This same protein is identified in the pat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.R.D. 544
238 F.R.D. 544
(Cite as: 238 F.R.D. 544)

ents in suit as a suitable "filler protein" and "binder protein," for use in food bars. At Solae, Grev was initially responsible for soy protein testing and processing. Later, she assumed responsibility for establishing standardized policies within protein technologies and manufacturing standards. Finally, she worked as a Project Manager on developing products, primarily for use in dry blended beverages. (Grev Resume (Doc. 88 Ex. E).)

FN1. The Solae Company was formerly Ralston Purina.

Grev states that her primary occupation now is as a stay-at-home parent. However, she has done some consulting work since leaving Solae, primarily for Cargill. In the fall of 2005, she consulted with Cargill regarding a series of soy protein isolates known as "Prolisse." (Grev Dep. 26:11-19.) Cargill's promotional materials state that Prolisse is used in protein bars (Sturgill Decl. & Exs. (Doc. 125).) and Cargill has offered its protein Prolisse to Nellson for use in nutritional bars. (Sturgill Decl. ¶ 4.)

Grev's specific consulting work for Cargill regarded its process for making the Prolisse proteins and how it could create proteins to meet customer specifications. (Id. 60:13-73:3.) She also gave her opinion regarding product consistency of the Prolisse proteins based on data provided to her. (Id. 86:1-87:14.) Finally, she did some work on lecithination, a process performed on proteins used in protein beverages, evaluating the protein's dispersability for beverage mixes meant to be mixed with water. (Id. 92:14-93-16.) Grev has not consulted with Cargill on any other topics, and was unaware that Cargill had any involvement with food bars while she was consulting for Cargill. (Id. 98:4-22; 140:19-22.) She does not currently have any assignments or responsibilities regarding consulting work for Cargill, but she does expect to consult with them in the future regarding productivity and "manufacturing on stream time," matters consistent with the type of work she has done for Cargill in the past. (Id. 140:19-141:12.)

Grev does have "proprietary knowledge of Solae's

processing that are covered by trade secrets." She did not ever sign an agreement with Solae promising not to disclose their trade secrets, but does not rely on Solae's proprietary information in her work for Cargill. (Id. 48:9-49:11.) She discussed in her deposition testimony how she would distinguish between proprietary and non-proprietary information, stating that "if it's a concept known within the industry, I would consider it not proprietary. Specifics or a concept that was developed within Solae, I would consider proprietary." (Id. 51:11-52:14.)

Grev has signed an Acknowledgment form agreeing to abide by the Protective Order.

**II. DISCUSSION**

[1] To resolve a dispute over disclosure of confidential information to experts, courts "balance the movant's interest in selecting the consultant most beneficial to the case, considering the specific expertise of this consultant and whether other consultants possess similar expertise, against the disclosing party's interest in protecting confidential commercial information from disclosure to competitors." *BASF Corp. v. United States,* 321 F.Supp.2d 1373, 1378 (C.I.T.2004); *accord Rice v. United States,* 39 Fed.Cl. 747, 750 (1997) (court must "balance the need of one litigant to access proprietary information in order to present his case, and the potential that irreparable harm may be suffered by the disclosing party.")

[2] Here, Elan has a strong interest in allowing Grev access to Dr. Ziegler's reports and attachments to those reports. The properties of proteins, such as water absorption and emulsification, and proper testing techniques**547** to determine the properties of a particular protein, are at issue in evaluating the viability of the patents in suit. Grev has spent her career working with proteins such as those at issue in this case, and has experience with soy protein testing. In addition, at Solae she did substantial work on a specific protein which is actually identified in the patents in suit as suitable for use in food bars. Her experience is therefore of unique relevance to this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.R.D. 544
238 F.R.D. 544
**(Cite as: 238 F.R.D. 544)**

While it is true that Elan has already shared information with its expert Dr. Moore, Elan need not be limited to a single expert witness. Although Nellson suggests that Elan could find an expert who does not currently work in the food industry through a university food science program, Elan should not be so severely limited in its choice of experts. Expert testimony will be essential to understanding the parties' claims in this case and Elan must have latitude to choose the experts that it believes have the necessary expertise and ability to convey highly technical information to the Court. *See Advanced Semiconductor Materials Am. Inc. (ASMA) v. Applied Materials Inc.,* 43 U.S.P.Q.2d (BNA) 1381, 1384, 1996 WL 908654 (N.D.Cal.1996). To be effective, these experts must have at least the minimal access to information designated as "confidential" or "confidential-attorneys' eyes only" that Elan requests here. Grev must be able to review Nellson's expert's reports and their attachments in order to respond adequately to those reports and prepare her testimony.

Nellson does have an interest in protecting its information from disclosure to its competitors. However, the risk that its information will be disclosed is not great. Grev has signed an Acknowledgment agreeing to abide and be bound by the obligations and conditions of the Protective Order, and consenting to the Court's jurisdiction for any proceeding to enforce its terms. The Court does not have reason to doubt the integrity with which she undertakes to keep Nellson's information confidential.[FN2]

> FN2. Nellson has suggested that Grev is untrustworthy based on a Declaration that she signed on October 10, 2006, submitted to the Court by Elan. In that Declaration, Grev stated that "to the best of my knowledge, Cargill has not supplied proteins for use in food bars. The Solae Company, and to the best of my knowledge, Cargill, do not make food bars." In her deposition testimony Grev stated that since submitting the declaration she had gotten the impression that Cargill does supply proteins for use in foods bars. (Grev.Dep.98:4-101:16.) She additionally testified that her intent in making that statement was to express her understanding that neither Cargill or Solae had food bars in commercial sale. However, Solae does make bars "within research." She was unaware when making the declaration of Cargill doing any research on bars. (*Id.* 120:15-23.) The Court credits Grev's testimony that her Declaration to the Court reflected the best of her knowledge at the time that it was signed and does not believe that she made representations in bad faith.

Nellson argues that even if Grev genuinely intends to abide by the conditions of the Protective Order, she will be unable to avoid using knowledge that she gains from her review of its confidential information in her work. This argument does have some persuasive force. *See BASF Corp.,* 321 F.Supp.2d at 1380 (citing *A. Hirsh, Inc. v. United States,* 657 F.Supp. 1297 (C.I.T.1987)). Under the circumstances at issue here, however, the risk of such inadvertent disclosures is at least limited. Grev is primarily a stay-at-home parent at this time, and her consulting work with Cargill has been and will likely continue to be relatively limited. She also has experience segregating her former employer's proprietary information and explained clearly during her deposition how she determines which information she will or will not use in her current consulting. Her current conduct with regard to Solae's information suggests that she will make every effort to similarly protect information that she views during her participation in this case.

Finally, Elan has limited the scope of its request. It now only requests that Grev have access to Dr. Ziegler's reports and their attachments. Grev will not be given broad or unfettered access to Nellson's files. Rather, she will view only this closed set of materials, limiting her exposure to Nellson's confidential information and greatly reducing the likelihood of an inadvertent disclosure.

**\*548 III. *CONCLUSION***

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.R.D. 544
238 F.R.D. 544
**(Cite as: 238 F.R.D. 544)**

After balancing Elan's interest in sharing information with Grev against Nellson's interest in protecting its confidential information, the Court finds that Elan's strong interest in selecting the expert of its choice outweighs Nellson's interest in nondisclosure. Therefore, Elan may share Dr. Ziegler's reports and their attachments with Grev in order to allow her to effectively serve as an expert witness. For the foregoing reasons, the Motion for Leave to Disclose Confidential Information is GRANTED.

D.Vt.,2006.
Nellson Northern Operating, Inc. v. Elan Nutrition, LLC
238 F.R.D. 544

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.