1   DANIEL JOHNSON, JR. (SBN 57409)
    BRETT M. SCHUMAN (SBN 189247)
2   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
3   San Francisco, CA  94105-1126
    Tel:  415.442.1000
4   Fax:  415.442.1001
    djjohnson@morganlewis.com
5   bschuman@morganlewis.com

6   ANDREW J. WU (SBN 214442)
    DAVID V. SANKER (SBN 251260)
7   **MORGAN, LEWIS & BOCKIUS LLP**
    2 Palo Alto Square
8   3000 El Camino Real, Suite 700
    Palo Alto, CA  94306-2122
9   Tel:  650.843.4000
    Fax:  650.843.4001
10  awu@morganlewis.com
    dsanker@morganlewis.com
11
    Attorneys for Plaintiffs and Counterdefendants
12  ALPHA & OMEGA SEMICONDUCTOR,
    LTD.
13  ALPHA & OMEGA SEMICONDUCTOR,
    INC.
14

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19  ALPHA & OMEGA SEMICONDUCTOR,          Case No. C 07-2638 JSW
    LTD., a Bermuda corporation; and      (Consolidated with Case No. C-07-2664 JSW)
20  ALPHA & OMEGA SEMICONDUCTOR,
    INC., a California corporation,
21                                        **AOS'S OPENING CLAIM
         Plaintiffs and Counterdefendants, CONSTRUCTION BRIEF PURSUANT TO
22                                        PATENT L.R. 4-5**
              v.
23
    FAIRCHILD SEMICONDUCTOR
24  CORP., a Delaware corporation,        Date:       June 4, 2008
                                          Time:       2:00 p.m.
25        Defendant and Counterclaimant.  Location:   Courtroom 2, 17th Floor
                                          Judge:      Hon. Jeffrey S. White
26  ─────────────────────────────────

    AND RELATED COUNTERCLAIMS.
27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

1-PA/3694812.1

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

**TABLE OF CONTENTS**

                                                                                    Page

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 2

      A.    AOS And Its Pioneering Patents ..................................................... 2

      B.    Overview of Power MOSFET Technology ....................................... 2

III.  INTERPRETATION OF DISPUTED TERMS ......................................... 3

      A.    Summary of Applicable Law ........................................................... 3

      B.    The '567 patent ............................................................................... 5

            1.    The Invention Of The '567 Patent ....................................... 5

            2.    "Several" is used in the specification to mean "two or more." ................... 6

            3.    "Configuring said gate runners for dividing said source contact
                  area into several sub-contact areas with a set of area proportional
                  ratios" ................................................................................. 8

                  a.    Fairchild's proposed limitation "after determining the total
                        number of lead wires" ............................................. 9

                  b.    Fairchild's proposed limitation "not all equal in size" .......... 10

                  c.    Fairchild's proposed limitation "is the same for each sub-
                        contact area" ........................................................... 11

      C.    The '630 Patent ............................................................................. 12

            1.    Background and Summary of the '630 Patent ....................... 12

            2.    The Disputed Phrase "applying a polysilicon mask for etching said
                  polysilicon layer to define a plurality of polysilicon gates" need not
                  be construed ...................................................................... 14

                  a.    "applying a polysilicon mask" ................................... 14

                  b.    "etching said polysilicon layer" ................................. 15

                  c.    "to define a plurality of polysilicon gates" .................. 15

                  d.    Fairchild's proposed construction would limit the invention
                        to planar-gate power MOSFETs, in violation of the well-
                        established rule prohibiting claim constructions that would
                        exclude preferred embodiments ................................... 16

      D.    The '776 Patent ............................................................................. 17

            1.    Background to the '776 patent ........................................... 17

            2.    The invention of the '776 patent ....................................... 18

            3.    "Compensating a portion of said body region by implanting
                  material of said second conductivity type in said body region" .......... 19

                  a.    Fairchild Proposes to Impose Additional Limitations Based
                        on "Peak Concentration" .......................................... 21

IV.   CONCLUSION ........................................................................................... 23

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ........................................................................................... 4

*Bowers v. Baystate Techs., Inc.*,
   320 F.3d 1317 (Fed. Cir. 2003) ........................................................................................... 7

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., Inc.*,
   123 F.3d 1445 (Fed. Cir. 1997) ........................................................................................... 9

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ........................................................................................... 9

*Kraft Foods, Inc. v. Int'l Trucking Co.*,
   203 F.3d 1362 (Fed. Cir. 2000) ........................................................................................... 4

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ........................................................................................................... 3

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ................................................. 4

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................................... 4, 8

*Renishaw PLC v. Marposs Societa' Per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998) ........................................................................................... 4

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ........................................................................................... 4

*Southwall Tech., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ............................................................................................. 4

*Spectra-Physics, Inc. v. Coherent, Inc.*,
   827 F.2d 1524 (Fed. Cir. 1987) ......................................................................................... 17

*SRI Int'l v. Matsushita Electric Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985) ......................................................................................... 11

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .............................................................................. 4, 7, 12, 16

*Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001) ..................................................................................... 4, 10

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

ii

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    __INTRODUCTION__

Plaintiffs Alpha & Omega Semiconductor, Ltd. and Alpha & Omega Semiconductor, Inc. (collectively, "AOS") assert that defendant and counterclaimant Fairchild Semiconductor Corp. ("Fairchild") infringes three AOS patents. The inventions taught and covered within these patents dramatically improved the performance of power MOSFETs, which are transistors used in a wide variety of electrical devices. The power MOSFET market is highly competitive, and dominated by a small number of mega-companies, including Fairchild.

The following is the claim construction brief of AOS concerning Patent Nos. 5,767,567 ("567"), 5,907,776 ("776") and 5,930,630 ("630"). As discussed below, AOS has construed the claim terms in a way consistent with the patent law and the understanding of one of ordinary skill in the art.

By contrast, in an attempt to avoid a finding of infringement, Fairchild seeks to unduly narrow the constructions of key claim terms. For some terms, Fairchild improperly imports limitations from the embodiments of the specification into the claims. Alternatively, Fairchild's proposed constructions add limitations without support in the specification, patent file history, or any technical reference.

In contrast, AOS follows the Federal Circuit's guidance and proposes a construction for each of the disputed terms[1] that adopts the plain meaning of the claim language, reflects how the terms would be understood by a person of ordinary skill in the art, and is consistent with the specifications and file histories of the patents. Rather than simply limit the claims to the embodiments disclosed in the specifications, AOS offers an analysis of how the words of the claims would be understood when considered in light of the entire intrinsic record, including the problems solved by each of the asserted patents. By applying the proper claim construction analysis, AOS proposes constructions that are faithful to the claimed inventions and comport with the actual patent contributions.

[1] The current briefing addresses the ten highest priority disputed claim terms selected by the parties. In this opening brief, AOS addresses only the four terms that appear in the AOS patents. AOS will address the six disputed terms in Fairchild's patents in AOS's opposition brief.

## II.    BACKGROUND

### A.    AOS And Its Pioneering Patents

AOS is a success story in the semiconductor industry and the Silicon Valley.  AOS was founded in September 2000, by seven engineers with over 120 years of combined experience in the semiconductor industry.  Headquartered in Sunnyvale, California, AOS designs power MOSFET products, but owns no fabrication facility (AOS is "fabless").  AOS first generated revenue from product sales in 2001, and became profitable the next year.  AOS is now among the fastest growing competitors in the discrete power MOSFET market.  In this litigation, AOS asserts three patents originally developed by MegaMOS Corporation ("MegaMOS") and assigned to AOS.

### B.    Overview of Power MOSFET Technology

To understand properly the innovations of the AOS patents-in-suit, a brief and high level overview of power MOSFET technology may be helpful to the Court.

A power MOSFET is an electronic switch, commonly used in devices such as cell phones and laptop computers.  A power



MOSFET comprises many, typically millions, of individual transistor "cells" working together to switch large amounts of power on and off.  Generally, the inventions of the AOS patents-in-suit improve the performance of power MOSFETs by (1) reducing resistance to the flow of electrical power, and (2) reducing the voltage required to turn the devices on, while (3) not decreasing the amount of power the devices can handle.

A power MOSFET is a type of transistor.  The basic structure of a transistor is that it typically has three terminals:  a gate terminal, a source terminal and a drain terminal.  The basic objective of a transistor is to pass electricity between the source and the drain on command.  In effect the transistor turns on and off allowing current to pass.  Typically the **gate** receives a control signal that will turn on the transistor.  A power signal is received at the input side, the

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

2

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  **source**, and passes through a channel, a region next to the **gate**, and then passes to the drain. The

2  power signal is then discharged by the drain to another device that is connected to the power

3  MOSFET.

4        Resistance to the flow of power may be affected by the path through which current flows

5  when the device is turned on. This is the "on-state resistance" of the device, also called $R_{DSON}$.

6  The farther current must travel through the power MOSFET, the more power is lost due to the

7  natural resistance of the semiconductor material through which the current passes. Declaration of

8  Andrew J. Wu, submitted herewith, Ex. 1 ("Wu Ex. 1"), '567 patent, col. 1:16-24.

9        The voltage required to turn on a power MOSFET is called the "threshold voltage," also

10  called $V_{TH}$. A lower threshold voltage allows the MOSFET to be switched on and off faster and

11  to be used in smaller products with increased battery life. *Id.*, at cols. 1:16-25; 4:5-8.

12        The voltage that a power MOSFET can handle before it fails is called the "breakdown

13  voltage," sometimes called $V_b$. When voltage exceeding $V_b$ is applied, the device fails and very

14  large amounts of power will flow even though the device should be turned off. For decades,

15  researchers have attempted to reduce the on-state resistance or power consumption of MOSFETs

16  without undesirably reducing breakdown voltage.

17        The AOS Patents in suit improve power MOSFET quality in at least three ways. The '567

18  patent reduces a power MOSFET's on-state resistance without decreasing breakdown voltage

19  ($V_b$) by connecting the power MOSFET to its packaging in a way that shortens the path through

20  which power must flow when the device is turned on. The '630 patent reduces a power

21  MOSFET's resistance without decreasing the breakdown voltage through an improved contact

22  and a simplified fabrication process. The '776 patent reduces a power MOSFET's threshold

23  voltage without decreasing $V_b$ by reducing the amount of charge in the material along the current

24  path of the device.

25  **III.**     **INTERPRETATION OF DISPUTED TERMS**

26      **A.**     **Summary of Applicable Law**

27        The interpretation of patent claims is a question of law to be decided by the Court.

28  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 371-73 (1996). To interpret the claims of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

3

1    a patent, the Court must consider the language of the claims, the specification, and the

2    prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995),

3    *aff'd*, 517 U.S. 370 (1996).  In construing a claim, the court must first look to the specific words

4    of a claim.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  The words of a claim

5    are generally given their ordinary meaning, unless it is apparent from the patent and the

6    prosecution history that the inventor used the term with a different meaning.  *Vitronics Corp. v.*

7    *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The court must interpret the claims in

8    view of the specification which "is the single best guide to the meaning of a disputed term."  *Id.*

9        The Federal Circuit has repeatedly warned, however, that claims should not be limited to

10   the embodiments disclosed in the specification.  *See Phillips*, 415 F.3d at 1323; *Renishaw PLC v.*

11   *Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998); *SciMed Life Sys., Inc. v.*

12   *Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001) (describing "one of the

13   cardinal sins of patent law - reading a limitation from the written description into the claims.")  At

14   the other extreme, a claim construction that would exclude a preferred embodiment is rarely, if

15   ever, correct.  *Vitronics*, 90 F.3d at 1583-4.

16       The words used by a patent should be construed to be consistent throughout the patent.

17   *Phillips*, 415 F.3d at 1314; *see also Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579

18   (Fed. Cir. 1995).  The varied use of a disputed term "attests to the breadth of a term rather than

19   providing a limiting definition."  *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340

20   F.3d 1298, 1308-09 (Fed. Cir. 2003).

21       The doctrine of claim differentiation creates a presumption that each claim in a patent has

22   a different scope.  *Kraft Foods, Inc. v. Int'l Trucking Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).

23   Hence, claim differentiation generally will prevent reading a limitation found in one claim into

24   another claim if that "limitation is the only meaningful difference between the two claims."

25   *Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).  *See*

26   *also Phillips*, 415 F.3d at 1324-25 (holding that the "baffles" in a claim did not inherently include

27   the limitations of other dependent and independent claims).

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

4    AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

### B.    The '567 patent

The invention of the '567 patent decreases on-state resistance and therefore wasted energy in power MOSFETs by shortening the path through which current must flow when the device is on.

### 1.    The Invention Of The '567 Patent

Power MOSFETs are encased within plastic packages, and a power MOSFET is connected to its packaging through one or more wires, called "lead wires."   These lead wires connect a lead frame of the packaging to "source contact areas" in the surface of the power MOSFET.



FIG. 1A
(PRIOR ART)

The "source contact area" is the surface of the power MOSFET to which power is applied, and to which the lead wires are connected.  '567 patent, col. 1:37-47.  Typically located on the top of the device, it provides a surface for connecting to each of the potentially millions of individual transistor cells comprised by the MOSFET device.  The source contact area may be divided into multiple sub-contact areas by structures called "gate runners."  *Id.*  "Gate runners" are stripes of conductive material.  For example, Figure 1A of the '567 patent (above) shows at least four gate runners that extend across the die surface.  These four gate runners create five sub-contact areas.  *Id.*  The gate runners connect the gates to a gate voltage supply.

In MOSFET designs prior to the '567 patent, significant energy was wasted due to the connection of the power MOSFET to its external packaging.  To lessen the expense and ease manufacturing, the prior art, shown in Figure 1A of the '567 patent, arbitrarily connected short lead wires (25) to the region of the contact areas close to the lead frame (20).  As a result, current flowing through transistor cells that are remote from the lead wire contacts has to travel across the source contact area for a long path before reaching the conductive lead wires.  '567 patent, col. 1:37-65.  Since the resistance along a current path is proportional to the distance the current must travel, the longer current path in the prior art designs led to more resistance, and hence more

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

5

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    wasted energy.

2         The '567 patent invention reduces on-state resistance, $R_{DSON}$, by distributing the lead

3    wires over the source contact area of the device and spreading the points of contact for the lead

4    wires over the contact area. '567 patent, Abstract, col. 2:29-34, col. 5:1-14. The '567 patent

5    describes several approaches to this distribution, including distributing the lead wires so that the

6    number of lead wires is proportional to the contact area. *E.g.,* '567 patent at col. 3:67-col. 4:60.

7    This aspect of the invention is recited in claim 7, which AOS asserts against Fairchild.

8         Claim 7 of the '567 patent recites as follows:

9

10         7. A method to configure a source contact area on a power
      MOSFET device by dividing said source contact areas with
      several gate runners disposed thereon, said method includ-
11    ing steps of:

12         (a) determining a total number of lead wires for connect-
              ing to a lead frame from said source contact area on
              said MOSFET power device; and

13         (b) configuring said gate runners for dividing said source
              contact area into several sub-contact areas with a set of
14            area proportional ratios for disposing several of said
              lead wires in each of said sub-contact areas according
15            to said set of area proportional ratios.

16

17    Wu Ex. 1, '567 patent. The disputed terms are highlighted in blue and green.

18              **2.    "Several" is used in the specification to mean "two or more."**

19

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| Several | Two or more | Three or more |

22         AOS's proposed construction of "several" is consistent with the inventors' use of that

23    term in the specification. Throughout the claims and the specification, the '567 patent uses the

24    words "several" and "plurality" to describe the number of gate runners, sub-contact areas, lead

25    wire contacts within a sub-contact area, and so on. The '567 patent's use of "several" within the

26    specification and claims requires that it be construed as "two or more."

27         Construing "several" to mean "three or more" – Fairchild's proposed construction –

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

6                                    AOS'S OPENING CLAIM CONSTRUCTION BRIEF
                                     PURSUANT TO PATENT L.R. 4-5
                                     (C 07-2638 JSW)

1   would be inconsistent with the specification.  Describing Figs. 2C and 2D, the '567 patent

2   discloses a method to configure the source contact area of a

3   power MOSFET including "disposing <u>several</u> of the lead

4   wires . . . in each of the sub-contact areas."  '567 patent, col.

5   5:54-55.[2]  As Fig. 2C of the '567 patent shows, the right-most

6   sub-contact area 150-4 contains only two lead wires.  (Note

7   that the short third wire at the lower right corner of the device



FIG. 2C

8   connects the lead frame G to the <u>gate</u> contact area, which is separate from the source contact area.

9   Declaration of C. Andre T. Salama, submitted herewith ("Salama Decl.") ¶ 2.  If "several" means

10  "three or more" as Fairchild proposes, the patent's statement that Figures 2C and 2D depict

11  several lead wires in each source sub-contact area would be incorrect.  '567 patent, col. 5:54-55.

12  Indeed, Fairchild's proposed definition would exclude this preferred embodiment from the claims

13  and so must be rejected.  *See Vitronics*, 90 F.3d at 1583-4.

14        Further, the term "several" must be construed to mean the same thing as "plurality,"

15  because the specification of the '567 patent uses the terms "several" and "plurality"

16  interchangeably to describe the same elements in the same figure.  For example, the specification

17  alternately describes both Figs. 2C and 2D as containing "a <u>plurality of gate runners</u> . . . disposed

18  on the source contact area," *Id.*, col. 5:37-40, and "source contact areas . . . with <u>several gate</u>

19  <u>runners</u> . . . disposed thereon," *Id.*, col. 5:45-53   Likewise, the specification describes gate

20  runners in Fig. 3 of the '567 patent that "divide the source contact area into a <u>plurality of sub-</u>

21  <u>regions</u>."  Col. 5:60-62   But the next paragraph describes the gate runners in Fig. 3 as "dividing

22  the source contact area into <u>several sub-contact areas</u>."  *Id.*, col. 6:15-18.  Because the patent uses

23  the terms "several" and "plurality" interchangeably, "several" should be construed to have the

24  same meaning as "plurality" – two or more.  In patent claims, a "plurality" means simply "more

25  than one."  *See, e.g., Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1332 (Fed. Cir. 2003) ("The

26  claim, however, uses the term 'plurality,' meaning 'comprising, or consisting of more than

27  ─────────────────

[2] Throughout this brief, any emphasis in quoted material was added to the original text, unless
stated otherwise.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

7        AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    one.'"").

2         AOS's proposed definition is also consistent with the plain meaning of "several," as

3    evidenced by dictionary definitions.  Merriam Webster's Collegiate Dictionary defines "several"

4    as "more than one."  Wu Decl. Ex. 5 at 1073. The Oxford English Dictionary states that "in legal

5    use" the word "several" means "more than one."  Wu Decl. Ex. 4 at 4.  The Microsoft Encarta

6    Collegiate Dictionary states that "several" is just "a grammatical word indicating a small

7    number").  Wu Decl. Ex. 6 at 1324.  To the extent Fairchild tenders dictionaries that define

8    "several" differently, those definitions are inconsistent with the patent specification and must be

9    rejected.  *See Phillips*, 415 F.3d at 1322-23 (holding that judges are free to consult dictionaries at

10   any time, "so long as the dictionary definition does not contradict any definition found in or

11   ascertained by a reading of the patent documents").

12                    **3.    "Configuring said gate runners for dividing said source contact area
                              into several sub-contact areas with a set of area proportional ratios"**

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| Configuring said gate runners for dividing said source contact area into several sub-contact areas with a set of area proportional ratios | The placement of gate runners divides the source contact area into sub-contact areas, and a set of area proportional ratios are defined by the ratios of the approximate areas of the sub-contact areas. | Arranging the gate runners, after determining the total number of lead wires, to define several sub-contact areas that are not all equal in size and such that the ratio of lead wires to area is the same for each of the sub-contact areas. |

21        The plain language of claim 7 of the '567 patent states that the placement or arrangement

22   of the gate runners divides the source contact area into sub-contact areas.  The plain language

23   states that the area proportional ratios of the sub-contact areas are the ratios of the sub-contact

24   areas.  Configuring the gate runners simply refers to placing the gate runners to divide the source

25   contact area into sub-contact areas in accordance with the other limitations of this claim element.

26   *See* '567 patent, col. 2:43-49, col. 5:45-57.  Since this is the plain meaning of the claim language,

27   this is where AOS's proposed construction ends.

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

8                    AOS'S OPENING CLAIM CONSTRUCTION BRIEF
                     PURSUANT TO PATENT L.R. 4-5
                     (C 07-2638 JSW)

Fairchild's proposed construction, on the other hand, would add three limitations not present in the plain language of the claim and would require a mathematical precision inconsistent with the preferred embodiments disclosed within the '567 patent itself.

a.    **Fairchild's proposed limitation "after determining the total number of lead wires"**

Although claim 7 of the '567 patent includes two steps, the claim language does not impose any order in which the steps must be performed, and does not require that the step of determining the number of lead wires must be performed prior to the step of configuring the gate runners.  It is settled that the steps in a method patent claim need not be performed in the order recited.  *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1343 (Fed. Cir. 2001) ("[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.")   Here, the preamble of claim 7 recites only that both steps must be "include[ed]." '567 patent, col. 8:36-37.[3]  One step consists of:

> determining a total number of lead wires for connecting to a lead frame from said source area on said MOSFET power device

*Id.*, col. 8:38-40.  This step does not mention any other step, does not explicitly or implicitly require any sequence of performance, and does not implicitly depend on any other step for its own performance.  The other step consists of:

> configuring said gate runners for dividing said source contact area into several sub-contact areas with a set of area proportional ratios

*Id.*, col. 8:41-43.  This operation also does not mention any other step, does not explicitly or implicitly require any sequence of performance, and does not implicitly depend on any other step for its own performance.  It is not necessary from a technical standpoint, to have determined the number of lead wires in order to configure the gate runners.  The disputed claim element "configuring the gate runners . . . with a set of area proportional ratios" does not depend on the determination of the number of lead wires; the number of lead wires could just as readily be determined after the configuration of the gate runners.  Nothing in the plain language of claim 7

---

[3] In addition, the usage of "including" is the same as "comprising," creating an open-ended list of elements. *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., Inc.,* 123 F.3d 1445, 1451 (Fed. Cir. 1997) (holding that "[t]he claim term 'including' is synonymous with 'comprising'").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

9

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  supports Fairchild's proposal that the gate runners must be arranged "after" determining the total

2  number of lead wires.

3      Moreover, because unasserted claim 8 of the '567 patent explicitly imposes a sequence for

4  performing the same two operations, claim differentiation dictates that that sequence should not

5  be imposed on claim 7. *See, e.g., Wenger Mfg., Inc.*, 239 F.3d at 1233. Claim 8, unlike claim 7,

6  requires "configuring said gate runners according [to] said total number of lead wires. . . ." *Id.*,

7  col. 8:55-56. The determination of the lead wires in claim 8 must occur first because the

8  configuration of the gate runners in claim 8 is made "according to" that number. Therefore, the

9  configuration of gate runners can occur either before, after, or at the same time as the

10  determination of the number of lead wires is determined for purposes of claim 7.

11          **b.    Fairchild's proposed limitation "not all equal in size"**

12      Another of Fairchild's proposed additions to the plain language of the disputed phrase is a

13  requirement that the sub-contact areas are "not all equal in size." This limitation is not only

14  unsupported by the intrinsic evidence, but the '567 patent and the canon of claim differentiation

15  both contradict Fairchild's proposed limitation.

16      Equations in the specification explicitly allow all of the sub-contact areas to have the same

17  size. The '567 patent teaches dividing the lead wires among the sub-contact areas. If the division

18  occurs evenly, then each sub-contact area has the same number of wires and the same size. That

19  situation is expressly permitted in the '567 patent, establishing that all of the sub-contact areas

20  may have the same size.

21      To explain the distribution process, the specification of the '567 patent introduces the

22  variables $N_{LW}$, the number of lead wires, and $N_{GR}$, the number of gate runners. '567 patent, col.

23  4:25-36. The number of sub-contact areas is $N_{GR} + 1$.[4]  *Id.*  $N_{BASIC}$, is the integer quotient of

24  dividing $N_{LW}$ by $N_{GR} + 1$ (*i.e.*, distributing the lead wires among the sub-contact areas). The

25  specification notes that there may be a remainder, $N_{REMAINDER}$, which is the number of lead wires

26  left over after distributing an equal number of lead wires to each sub-contact area:

27

28

[4] With one gate runner, there are two sub-contact areas, and so on. The number of sub-contact areas is generally one more than the number of gate runners.

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

$$N_{LW} = (N_{GR}+1) \times N_{BASIC} + N_{REMAINDER}$$

*Id.* For example, if you divide 7 by 3, you get a quotient of 2 and a remainder of 1. That is, $7 = 3 \times 2 + 1$. Similarly, dividing 14 by 3 yields a quotient of 4 and a remainder of 2. That is, $14 = 3 \times 4 + 2$. As a final example, 3 divides into 15 evenly, so the remainder is zero: $15 = 3 \times 5 + 0$. As these examples show, the remainder is zero when the division occurs evenly.

The specification explicitly states that the remainder $N_{REMAINDER}$ can be zero at col. 4:33-36. When the remainder is zero, <u>all of the sub-contact areas have the same size</u> and the same number of lead wires. Without more, this requires rejection of Fairchild's proposed construction.

Further, because the limitation of "different size sub-contact areas" appears in other claims besides claim 7, the principle of claim differentiation once again prohibits importation of this limitation into claim 7. *See, e.g., SRI Int'l v. Matsushita Electric Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("[i]t is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). The limitation of different size sub-contact areas appears in claims 1, 5, and 6 – but <u>not</u> in claim 7.

### c.  Fairchild's proposed limitation "is the same for each sub-contact area"

Fairchild also proposes to create from whole cloth an additional requirement that "the ratio of lead wires to area is the same for each of the sub-contact areas." Nowhere in the phrase to be construed are lead wires even mentioned. Nor does the rest of claim 7 discuss the "ratio of lead wires to area." Indeed, the distribution of the lead wires is determined by the ratio of the sub-contact areas to each other, not by the ratio of lead wires to sub-contact areas. *Id.*, col. 8:41-45. The claim language describes an area proportional ratio, <u>not</u> an area-to-lead wire ratio.

Even if the ratios were area and lead wire based, Fairchild's proposed requirement that the ratio be the "same" for each sub-contract area must be rejected. The figures and specification of the '567 patent demonstrate that the set of area proportional ratios is defined by the <u>approximate</u> areas of the sub-contact areas, without mathematical precision. For example, the specification describes the prior art Figs. 1A and 1B as dividing the source contact area into "equally divided

Morgan, Lewis & Bockius LLP
Attorneys At Law
Palo Alto

11

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  areas." That is, with an area proportional ratio of 1:1. '567 patent, cols. 1:43-44; 2:3-4.

2  However, the sub-contact areas in these figures plainly are not equal; they are merely

3  approximately equal. The rightmost sub-contact region in Fig. 1A has a small area cut out of it to

4  supply space for the gate contact region. *Id.*, Fig. 1A. Similarly, the left-most sub-contact area in

5  Fig. 1B has a small area cut out of it to supply space for the gate contact region. *Id.*, Fig. 1B. The

6  same can also be seen in each of the other embodiments. The Court's construction must allow the

7  set of area proportional ratios to be defined by the ratios of the approximate areas of the sub-

8  contact areas - otherwise, the preferred embodiments themselves would be excluded. *See*

9  *Vitronics*, 90 F.3d at 1583-4.

10  ## C.    The '630 Patent

11  ### 1.    Background and Summary of the '630 Patent

12  The structure of a power MOSFET is created during the fabrication process through a

13  sequence of operations that build the device, step by step, atop a silicon wafer substrate. These

14  operations may include steps such as depositing layers of different materials on the substrate,

15  doping regions of the device with charged particles, or etching away portions of the substrate to

16  define desired physical structures.

17  Many of these operations require a "mask." A mask is simply a stencil that covers certain

18  areas and leaves others open. Like a painter using a stencil to define an area in which to paint, a

19  semiconductor manufacturer applies masks to the surface of the unfinished MOSFET to define

20  areas that will be subjected to various operations during fabrication. Salama Decl. ¶ 5.

21  Openings in the mask expose areas of the substrate that are then etched. "Etching" is one

22  of the operations used to form physical structures in a power MOSFET. Etching removes layers

23  of material through certain chemical or physical processes. Material covered by the mask will not

24  be removed; material left exposed by the mask will be etched away. Salama Decl. ¶¶ 4, 5.

25  One of the physical structures defined during fabrication is the "gate." As discussed

26  earlier, the gate is the structure that turns a transistor on when a voltage exceeding the threshold

27  voltage, $V_{TH}$, is applied to the gate. Gates can be either "planar" or "trenched." A planar gate sits

28  on top of the substrate. A trenched gate extends downward into the substrate. Salama Decl. ¶¶ 6,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

12

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

7.

   The invention of the '630 patent improved over the prior art in at least two ways. Generally, the '630 patent avoids the need for a separate masking step that had been required in the prior art processes by using as a mask the insulation layers covering the gates. *E.g.,* '630 patent, col. 4:24-34 ("insulation layers covering the gates are employed as ion-blocks for body implants … whereby the requirements of additional masks or sidewall spacers as that employed in the prior art are no longer necessary"). This process is recited in claim 1 of the '630 patent. Also, the invention of the '630 patent provides a source contact structure with reduced on-state resistance in the contact to the source regions, by removing the top portion of the source contact region to reduce the device's contact resistance. *E.g.,* '630 patent, col. 4:5-9. This aspect of the invention is recited in claim 3 of the '630 patent.

   Claim 1 of the '630 patent recites as follows:

> **1.** A method for fabricating a MOSFET transistor on a substrate comprising steps of:
>   a) forming an epi-layer of a first conductivity type as a drain region in said substrate and then growing an initial oxide layer over said epi-layer;
>   (b) applying an active mask for etching said active layer to define an active area followed by depositing an overlaying polysilicon layer thereon and applying a polysilicon mask for etching said polysilicon layer to define a plurality of polysilicon gates;
>
>   (c) removing said polysilicon mask then carrying out a body implant of a second conductivity type followed by performing a body diffusion for forming a plurality of body regions;
>   (d) applying a source blocking mask for implanting a plurality of source regions in said body regions with ions of said first conductivity type followed by removing said source blocking mask and a source diffusion process;
>   (e) forming an overlying insulation layer covering said MOSFET device followed by applying a contact mask to open a plurality of contact openings there-through; and
>   (f) performing a low energy body-dopant implant and high energy body dopant implant to form a self-aligned shallow high concentration body dopant region and a self-aligned deep high concentration body dopant region.

Wu Ex. 3, '630 patent. The disputed term is highlighted in yellow.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

13

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

2.    **The Disputed Phrase "applying a polysilicon mask for etching said polysilicon layer to define a plurality of polysilicon gates" need not be construed.**

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| Applying a polysilicon mask for etching said polysilicon layer to define a plurality of polysilicon gates | The meaning of this phrase is clear and unambiguous to a person of skill in the art, and thus it need not be construed by the court. | Applying a mask having a plurality of openings to allow the removal of areas of a polysilicon layer to form a plurality of polysilicon gates corresponding to the plurality of areas of the mask which are not open. |

The phrase "applying a polysilicon mask for etching said polysilicon layer to define a plurality of polysilicon gates" has a clear meaning to a person of skill in the art of power MOSFET devices, and is supported by the specification. '630 patent; Salama Decl. ¶ 3. As discussed above, a mask is used as a stencil during the etching of polysilicon material. Following the etching, polysilicon gates are defined. This claim element includes three phrases, each of which is clear enough that the additional construction proposed by Fairchild is unnecessary and inappropriate. Moreover, the purpose and effect of Fairchild's proposed construction would be to exclude all trenched-gate devices—including a preferred embodiment of the '630 patent—from the scope of the claims. Therefore, even if the Court were to construe the claim element, Fairchild's proposed construction must be rejected.

a.    **"applying a polysilicon mask"**

This phrase has a plain meaning, and there is no suggestion in the claim language or intrinsic evidence that the phrase should include the additional limitations proposed by Fairchild that the mask "have a plurality of openings to allow the removal of areas of a polysilicon layer to form a plurality of polysilicon gates." Like the painter's stencil, a semiconductor wafer fabricator uses masks to isolate areas subject to various fabrication operations. Salama Decl ¶¶ 4, 5. Typically, a series of masks and associated etching operations are required to fabricate a power MOSFET. *Id.* The '630 patent identifies one of the masks as a "polysilicon mask" because the mask isolates portions of a previously-formed polysilicon layer that will be etched. Masking is a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

14

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    basic, routine operation common to all semiconductor wafer fabrication, well understood by

2    persons skilled in the art. *See* '630 patent, col. 7:11-23.

3                    **b.    "etching said polysilicon layer"**

4          Likewise, this phrase has a plain meaning and should not be construed to include the

5    additional limitations proposed by Fairchild. Etching refers to removal of at least some of the

6    polysilicon material through a chemical or physical process. Both AOS and Fairchild use etching

7    in the fabrication of power MOSFETs, and there appears to be no dispute about what constitutes

8    etching. Salama Decl. ¶ 4. Before etching, a mask covers part of a layer of material previously

9    formed on the substrate surface. *Id.* Etching then removes material from the areas that are not

10   covered by the mask. *Id.* Because etching has a well-defined meaning that is not in dispute, there

11   is no reason to replace the concise claim language with Fairchild's proposed phrase "having a

12   plurality of openings to allow the removal of areas of a polysilicon layer."

13                  **c.    "to define a plurality of polysilicon gates"**

14         This phrase also has a plain meaning. A layer of polysilicon material is etched so that

15   some of the polysilicon is removed, and the polysilicon that is not removed becomes the

16   polysilicon gates. '630 patent, col. 7:11-16. Defining gates in planar-gate and trenched-gate

17   power MOSFETs are standard operations common to semiconductor wafer fabrication.

18         A planar gate is defined by its horizontal

19   dimension. Salama Decl ¶ 7. To the right is an

20   example showing a portion of Fig. 5B of the '630

21   patent. Rectangle 125 is a gate. Prior to etching,

22   there was material to the left and the right of this gate,

23   and the mask <u>covered the gate</u>. Etching removed the

24   excess material to the left and right of the mask, thus

25   defining the gate's horizontal dimensions. *Id.*



FIG. 5B

26

27         In a trenched-gate device, by contrast, a gate is

28   defined by its vertical dimension. *Id.* To the right is an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

15

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

example showing a portion of Fig. 6 of the '630 patent.  The portion labeled 225 is a trenched gate, shown here at a later stage in fabrication. Prior to etching, there was polysilicon "gate" material that extended further vertically. A mask covered other regions of the substrate, so that it only <u>exposed the gate.</u> Etching removed the excess gate material from the substrate surface above the trench, thus defining the gate's vertical dimension. *See* '630 patent, Fig. 6.

Defining planar or trenched polysilicon gates through these etching processes is basic to semiconductor wafer fabrication and well understood by persons of skill in the art. Salama Decl. ¶¶ 3-5, 7.

> **d.    Fairchild's proposed construction would limit the invention to planar-gate power MOSFETs, in violation of the well-established rule prohibiting claim constructions that would exclude preferred embodiments.**

Fairchild proposes to add a limitation not present in the disputed claim language: "corresponding to the plurality of areas of the mask which are not open." It appears that Fairchild's proposed claim language is intended to exclude trench gates on the theory that they are defined by the etching in the area of the mask that is open. As noted above, in a trenched-gate power MOSFET, the gates are defined by the distance the polysilicon is etched downward into the substrate beneath the opening in the mask, rather than by the width of the mask used to etch the polysilicon. In fact, the mask <u>exposes the gate material in the trenched gates</u> to etch away excess material, thus defining the vertical dimension of the gate. *See* '630 patent, Fig. 6; Salama Decl ¶ 7. Because Fairchild's proposed construction excludes a preferred embodiment from the '630 patent's specification, it should be rejected. *See Vitronics*, 90 F.3d at 1583.

To support its proposed exclusion of trenched gates from the claims, Fairchild misleadingly cites only the figures in the '630 patent that depict planar-gate devices, and cites

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

16

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    only the language in the specification that provides a detailed description of planar-gate devices.

2    Wu Ex. 11, *see* Joint Claim Construction and Pre-Hearing Statement, Ex. B at 5.

3         The specification expressly includes trenched gate structures.  First, Fig. 6 depicts a

4    trenched-gate MOSFET device, and the specification states that Fig. 6 is a view "of a trenched

5    MOSFET device <u>of the present invention</u>." *Id.* at col. 5:44-45.  In particular, Fig. 6 depicts the

6    teachings of the patent: it shows the shallow and deep high-concentration body-dopant regions

7    (region 260, labeled SP+, and region 265, labeled DP+), and the removal of a top portion of the

8    substrate (silicon etch of depth $\delta$).  Second, the specification at cols. 8:55-9:17 describes the

9    formation of a trenched-gate MOSFET device, with particular emphasis on the shallow and deep

10    high-concentration body-dopant regions.  Because the process of etching to define gates is well-

11    known, the patent need not repeat it.  *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534

12    (Fed. Cir. 1987) ("[a] patent need not teach, and preferably omits, what is well known in the

13    art.").  Fairchild's attempt to exclude all trenched-gate MOSFETs from the coverage of the

14    asserted claim improperly ignores all of this intrinsic evidence.  It also violates the rule, adverted

15    to above, prohibiting constructions that would exclude a preferred embodiment.

16         The Court also should reject Fairchild's proposed definition because it is inconsistent with

17    the plain language of the claims.  Etching can define either horizontal or vertical dimensions of

18    device elements.  Salama Decl. ¶ 7.  There is nothing inherent in the words "etch" or "define" that

19    would limit their use to horizontal dimensions.  Salama Decl. ¶¶ 3-5, 7.

20    **D.    The '776 Patent**

21         **1.    Background to the '776 patent**

22         The invention of the '776 patent made possible power MOSFETs having a lower

23    threshold voltage, $V_{TH}$, resulting in faster, more efficient devices without compromising

24    reliability.  As discussed below, the inventors of the '776 patent came up with a design in which

25    the doping concentration of material in a particular part of the current path in the device was

26    reduced, thereby reducing the amount of charge that must be overcome to turn on the device.

27         Power MOSFETs include regions (e.g., source, body, drain) having opposite conductivity

28    types.  Typically referred to as n-type or p-type, "conductivity" indicates whether a region of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

17

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    transistor carries an excess of Negative charge carriers (electrons) or Positive charge carriers

2    ("holes"). This excess of charge carriers is typically achieved through "doping" the underlying

3    silicon material with a dopant such as arsenic or boron. The doping concentration is often labeled

4    with a "+" or "-" to indicate heavily or lightly doped regions. A region of one conductivity type

5    is "compensated" if impurities of the opposite conductivity type are put into the region to reduce

6    its doping concentration. Salama Decl. ¶ 8.

7                        **2.    The invention of the '776 patent**

8             Prior art trenched-gate power MOSFETs had inherently high threshold voltage, $V_{TH}$, that

9    was typically barely below the voltage of the power supply used in many applications. '776

10   patent, at col. 2:8-20. Such prior art devices were unsuitable for certain low power applications,

11   such as low power applications using batteries, which drop in power over time. *Id.* Prior to the

12   invention of the '776 patent, prior art attempts to reduce the threshold voltage resulted in lower

13   production yield (more devices fail to work properly) or less reliable devices (more devices fail

14   during use). '776 patent, col. 2:42-51. Another consideration was prevention of a phenomenon

15   known as "punch-through." When punch-through occurs, a current-conducting channel is formed

16   in the body region between the source and drain even if no voltage is applied to the gate. As a

17   result, current flows between the source and drain even when the MOSFET is supposed to be off.

18   The '776 patent describes how prior art attempts to reduce threshold voltage resulted in low

19   punch-through tolerance. *Id.* at col. 2:52-col. 3:23.

20            The '776 patent teaches a method of reducing the threshold voltage of a power MOSFET

21   device without sacrificing production yield or reliability of the devices, and without

22   compromising punch-through tolerance. The '776 patent achieves this goal by "compensating" a

23   portion of the body region adjacent the source region with dopants whose conductivity type is the

24   opposite of the conductivity type of the body region. *Id.* at col. 3:50-58. For example, if the body

25   region is p-type and the source region is n-type, the invention of the '776 patent includes

26   compensating a portion of the body region adjacent to the source region with n-type dopants.

27   Salama Decl ¶ 8. This compensation is accomplished by "ion implanting" dopants into the

28   silicon material, *i.e.,* bombarding the silicon structure with atoms or molecules of the dopant.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

18                                   AOS'S OPENING CLAIM CONSTRUCTION BRIEF
                                      PURSUANT TO PATENT L.R. 4-5
                                              (C 07-2638 JSW)

1    '776 patent, at col. 5:48-61.  Because of the reduced overall charge in the compensated portion of

2    the body region, less voltage is required to turn on the device, and the threshold voltage of the

3    device is reduced.  *Id.* at 58-61.

4         Claim 1 of the '776 patent recites as follows:

> **1. A method of forming a semiconductor structure comprising the steps of:**
> (a) providing a substrate having a major surface;
> (b) forming at least one trench in said substrate;
> (c) forming a body region of a first conductivity type in said substrate, said body region having a diffusion boundary in said substrate;
> (d) forming a source region of a second conductivity type in said body region; and
> (e) compensating a portion of said body region by implanting material of said second conductivity type in said body region. said portion being proximal to said source region and spaced from said diffusion boundary of said body region and said major so as to reduce the impurity concentration of said first conductivity type in said portion of said body region.

12   Wu Decl., Ex. 2.  The disputed claim language is highlighted.  The same claim language appears

13   in claims 13 and 25, which are also asserted by AOS.

14         **3.    "Compensating a portion of said body region by implanting material**

15              **of said second conductivity type in said body region"**

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
| --- | --- | --- |
| Compensating a portion of said body region by implanting material of said second conductivity type in said body region | Implanting into the body region material having conductivity type opposite the conductivity type of the body region. | Implanting impurities of the second conductivity type into the body region such that the peak concentration of that implant is located in the body region, and such that the conductivity type at the location of the peak concentration of that implant does not change. |

24         AOS proposes a construction for this claim element that simply tracks the plain language

25   of the claim: implanting material of the opposite conductivity type into the body region.  Fairchild

26   seeks to incorporate two additional limitations regarding "peak concentration" into this

27   straightforward claim language.  These additional limitations are without support in the claim

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

19                        AOS'S OPENING CLAIM CONSTRUCTION BRIEF
                         PURSUANT TO PATENT L.R. 4-5
                         (C 07-2638 JSW)

1    language, specification, prosecution history, or any other evidence identified by Fairchild.

2        The specification of the '776 patent explains the process of compensating a portion of the

3    body region in multiple locations.  *See, e.g.*, '776 patent at Abstract; col. 3:55-58 ("A

4    predetermined portion of the body region adjacent to the source region is *compensated* in

5    impurity concentration by ion implanting a material of the second conductivity into the body

6    region." )  In the diagram to the right (from the '776 patent), 14 is the source, and 21 is the

7    channel (which is part of the body 12).  The portion that is compensated is near the top of the

8    channel, roughly where the dotted line from 21 ends.  As the specification states, compensation

9    involves ion implanting impurities into the body.  The implanted impurities have conductivity

10   type opposite that of the body region.  This is exactly the definition proposed by AOS.

11       Moreover, the '776 patent uses the term "compensating" with the standard meaning in the

12   art.  For example, the IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.

13   1997) defines "doping compensation" as "[a]ddition of donor impurities [i.e., n-type] to a p-type

14   semiconductor or of acceptor impurities [i.e., p-type] to an n-type semiconductor."  Wu Decl. Ex.

15   7 at 313.  This Sixth edition of the IEEE Standard Dictionary was published in 1997, the same

16   year the application for the '776 patent was filed.  *Id.*  The Wiley Electrical and Electronics

17   Engineering Dictionary (2004) defines "compensated semiconductor" as "[a] semiconductor with

18   two types of impurities or imperfections, in which the electrical effects of one type of impurity or

19   imperfections partially cancels the other.  For instance, a donor impurity partly annulling the

20   electrical effects of an acceptor

21   impurity."  Wu Decl. Ex. 10 at 130.

22   *See also* Wu Decl. Exs. 8, 9.  All of

23   these highly-regarded technical

24   dictionaries show that the essential

25   feature of compensating is adding

26   impurities of opposite conductivity

27   type.  Salama Decl. ¶ 8.  This is the



28   same meaning applied in the specification and proposed in AOS's definition.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

20

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

### a. Fairchild Proposes to Impose Additional Limitations Based on "Peak Concentration"

The phrase "peak concentration" does not appear anywhere in the specification of the '776 patent. Neither the specification nor the claim language include any statement or suggestion that the "compensating" step of claim 1 requires that "the peak concentration of that implant is located in the body region," or that "the conductivity type at the location of the peak concentration of that implant does not change."

Nor has Fairchild identified any other evidence supporting its proposed limitations. Technical dictionaries and treatises that define compensation do not refer to "peak concentration" or any similar phrase. Fairchild has not identified any references that support its construction, and an extensive investigation of technical resources yielded none that included "peak concentration" in the definition of compensation. *See, e.g.*, Wu Decl. Exs. 7-10.

Moreover, the '776 patent specification refutes Fairchild's proposed limitations. To understand Fairchild's proposed definition and how the example refutes it requires a brief overview of the process of ion implantation.



Ion implantation involves bombarding a target with energized ions. Salama Decl. ¶ 9. The greater the energy of the ions, the greater the penetration into the target. Salama Decl. ¶ 9. See also '776 patent at Fig. 6 (showing the relationship between ion energy and penetration distance for arsenic (As), Phosphorus (P), and boron (B)). Due to random collisions, ions of the same energy penetrate the target to varying depths. See, e.g., '776 patent at Fig. 5, a portion of which is shown at the right. Dotted curve 70B shows the varying depths of the implanted ions with average depth of b. The distribution of depths is much like the distribution of scores on a standardized test (a "bell curve"). The bell curve of depths has a peak where the highest number of ions penetrate. This is

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

21

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1   the depth that Fairchild refers to as the "peak concentration."

2       Fairchild proposes that a region is not compensated unless the "peak concentration" of the

3   implant is in that region.  For example, if the "peak concentration" of an implant is in the source

4   region rather than the body, then Fairchild would say that the body region has not been

5   compensated.  Regardless of how many ions have been implanted into the body region and

6   cancelled the impurities in the body region, Fairchild asserts that there is no compensation unless

7   the "peak concentration" is in the body region.

8       Not only is Fairchild's proposed definition implausible, it is contrary to the teaching of the

9   '776 patent specification, specifically, Figure 4 and Figure 5 and corresponding description at col.

10  5:48-54 and col. 7:40 – 8:4.  In Figure 4 and Figure 5, the horizontal axis (labeled as

11  "DISTANCE") is the depth within the substrate, with the top of the substrate to the left ($x = 0$)

12  and the bottom of the substrate to the right.  In Figure 4, the region to the left of $x=x_{js}$ is the

13  source region, and the region to the right of $x=x_{js}$ is the body region.  '776 patent, col. 5:19-22.

14  Curve 64 represents the doping concentration in the source region, curve 66 represents the doping

15  concentration in the body region, and the vertical dotted line at $x = x_{js}$ shows where the source

16  meets the body.  Dotted curve 30 shows the overall doping prior to the compensation step.  *Id.* at

17  col. 5:22-36.

18      The three dotted curves 70A, 70B, and 70C in Figure 5 represent three implants at depths

19  a, b, and c, respectively.  According to the specification, these three implants together produce

20  compensation curve 70, *i.e.,* each is a compensation step.  *Id.* at col. 5:48-61.  Under Fairchild's

21  proposed definition, however, step 70C does compensate the body, but 70A does <u>not</u> because the

22  "peak concentration" of implant 'a' is in the source region.  Since 70A is in the source region,

23  Fairchild's proposed construction is therefore directly at odds with the specification.

24  **IV.   CONCLUSION**

25      For all the foregoing reasons, AOS's proposed constructions should be adopted.

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

22       AOS'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1

Dated: March 13, 2008                    MORGAN, LEWIS & BOCKIUS LLP

2

By  /s/ Daniel Johnson, Jr.

3                                              Daniel Johnson, Jr.

4                                          Attorneys for Plaintiffs and Counterdefendants
                                         ALPHA & OMEGA SEMICONDUCTOR, LTD.
5                                        AND ALPHA & OMEGA SEMICONDUCTOR,
                                         INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

AOS'S OPENING CLAIM CONSTRUCTION BRIEF
                                         PURSUANT TO PATENT L.R. 4-5
                                         (C 07-2638 JSW)

**GENERAL ORDER ATTESTATION**

Pursuant to General Order No. 45, Section X(B) regarding signatures, I, Andrew J. Wu attest that concurrence in the filing of this document has been obtained from Daniel Johnson, Jr.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 13th day of March, 2008, at Palo Alto, California.

<u>/s/ Andrew J. Wu</u>
Andrew J. Wu

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

24