DANIEL JOHNSON, JR. (SBN 57409)
BRETT M. SCHUMAN (SBN 189247)
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA  94105-1126
Tel:  415.442.1000
Fax:  415.442.1001
djjohnson@morganlewis.com
bschuman@morganlewis.com

ANDREW J. WU (SBN 214442)
DAVID V. SANKER (SBN 251260)
**MORGAN, LEWIS & BOCKIUS LLP**
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, CA  94306-2122
Tel:  650.843.4000
Fax:  650.843.4001
awu@morganlewis.com
dsanker@morganlewis.com

Attorneys for Plaintiffs and Counterdefendants
ALPHA & OMEGA SEMICONDUCTOR, LTD.
ALPHA & OMEGA SEMICONDUCTOR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALPHA & OMEGA SEMICONDUCTOR, LTD., a Bermuda corporation; and ALPHA & OMEGA SEMICONDUCTOR, INC., a California corporation, <br><br> Plaintiffs and Counterdefendants, <br><br> v. <br><br> FAIRCHILD SEMICONDUCTOR CORP., a Delaware corporation, <br><br> Defendant and Counterclaimant. <br><br> ——————————————— <br><br> AND RELATED COUNTERCLAIMS. | Case No. C 07-2638 JSW <br> (Consolidated with Case No. C-07-2664 JSW) <br><br> **AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5** <br><br> Date:        June 4, 2008 <br> Time:        2:00 p.m. <br> Location:    Courtroom 2, 17th Floor <br> Judge:       Hon. Jeffrey S. White |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

      A.    The Mo Patents ........................................................................................ 2

            1.    The Purported Invention .................................................................. 2

            2.    The Prosecution History................................................................... 3

      B.    The '947 Patent ........................................................................................ 3

III.  INTERPRETATION OF DISPUTED TERMS ................................................... 4

      A.    The Mo Patents ('481, '406, '497, 195, and '111)................................... 4

            1.    The Court Should Reject Fairchild's Proposed Definition Of The
                  Term "Abrupt Junction" And Adopt AOS's Proposed Definition............ 5

                  a.    AOS's Proposed Construction Is Based Squarely On The
                        Definition Used By The Inventors To Obtain The Patents,
                        And Is Otherwise Consistent With The Claim Language
                        And Specifications ....................................................................... 5

                  b.    Fairchild's Proposed Construction Is Inconsistent With The
                        Prosecution History And The Other Intrinsic Evidence ................. 7

                  c.    Other Problems With Fairchild's Proposed Claim
                        Construction And Supporting Argument ........................................ 8

            2.    The Court Should Adopt AOS's Proposed Construction Of The
                  Disputed Phrase "Resulting In Avalanche Current That Is
                  Substantially Uniformly Distributed" ............................................. 10

                  a.    Because Structures In The Termination Region Draw
                        Avalanche Breakdown Current Away From The Active
                        Region Of The Device, The Uniform Distribution Of
                        Avalanche Current Must Include The Termination Region.......... 11

                  b.    The Patent Supports The Portion Of AOS's Proposed
                        Construction That Requires The Measurement Of
                        Breakdown Current At Breakdown Initiation .............................. 12

            3.    The Term "Adjusting" Must Be Construed, And The Court Should
                  Adopt AOS's Proposed Construction ............................................. 13

                  a.    The Claim Language, Specification, And Prosecution
                        History Require That "Adjusting" Be Performed With The
                        Intent To Affect The Peak Electric Field ................................... 14

                  b.    "Adjusting" Involves Repeated Experiments Or Computer
                        Simulation ............................................................................... 15

                  c.    Moving The Breakdown Initiation Point Away From The
                        Trench Should Be Interpreted To Mean Toward The Center
                        Of The Body Region Of The Device .......................................... 16

                  d.    The Court Should Reject Fairchild's Attempt To Eliminate
                        The "Adjusting" Limitation From The Claims ............................ 17

      B.    The '947 Patent ...................................................................................... 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

# TABLE OF CONTENTS
## (continued)

Page

1.    The Court Should Reject Fairchild's Obvious Attempt To Broaden The Meaning Of The Term "Acting As A Field Plate" And Adopt AOS's Proposed Construction .................................................................... 17

    a.    The Claims And Specification Require That The Conductive Ring Must Be Formed Completely In A Trench .......................... 18

    b.    The Field Plate Must Modify The Depletion Layer In The Underlying Silicon ...................................................................... 19

2.    The Court Should Reject Fairchild's Attempt To Define "Same" As Including "Different" ..................................................................... 21

3.    The Court Should Adopt AOS's Construction Of The Term "Isolation Trench" And Reject Fairchild's Proposed Construction; Fairchild's Proposed Construction Is Based Principally – And Improperly – On Extrinsic Evidence From Its Expert Witness. .............. 22

    a.    An Isolation Trench Must Actually Be A Trench ......................... 23

    b.    An Isolation Trench – Like Any Other Trench - Must Have Two Sidewalls ............................................................................ 23

IV.    CONCLUSION ...................................................................................................... 25

Morgan, Lewis &
Bockius LLP
Attorneys At Law
San Francisco

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000)........................................................................ 20

*ASM America, Inc. v. Genus, Inc.*,
    2002 WL 1892200, *15 (N.D.Cal. 2002) ........................................................ 5

*Biagro Western Sales, Inc. v. Grow More, Inc.*,
    423 F.3d 1296 (Fed. Cir. 2005)........................................................................ 1

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)........................................................................ 7

*Combined Sys. v. Def. Tech. Corp of America*,
    350 F.3d 1207 (Fed. Cir. 2003)........................................................................ 15

*Grantley Patent Holdings, v. Clear Channel Commc'ns, Inc.*,
    2008 U.S. Dist. LEXIS 1588, *17 (E.D. Tex. 2008) ...................................... 20

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
    381 F.3d 1111 (Fed. Cir. 2004)........................................................................ 17

*Koito Mfg Co., v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004)........................................................................ 15

*Markman v. Westview Instruments, ,*
    517 U.S. 370 (1996)......................................................................................... 11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................. 11, 19, 25

*Rockwell Int'l Corp. v. United States*,
    147 F.3d 1358 (Fed. Cir. 1998)........................................................................ 3

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003)........................................................................... 1

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)........................................................................... 18

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    I.    **INTRODUCTION**

2         In its opening claim construction brief, Fairchild Semiconductor Corporation ("Fairchild")

3    readily acknowledges the well-settled rules for claim construction and then proceeds immediately

4    to ignore them.  Instead of focusing on the intrinsic evidence, *i.e.*, claim language, patent

5    specifications, and the prosecution histories of the Fairchild patents-in-suit, Fairchild relies

6    heavily – and, at times, exclusively – on a twenty-eight page declaration from its hired expert, Dr.

7    Richard Blanchard.

8         Fairchild's proposed claim constructions should be rejected.  The testimony of Dr.

9    Blanchard cannot make up for the fact that Fairchild's proposed constructions are unsupported

10   (and unsupportable) based on the intrinsic evidence.  *E.g., Biagro Western Sales, Inc. v. Grow*

11   *More, Inc.*, 423 F.3d 1296, 1302-3 (Fed. Cir. 2005) (rejecting claim construction based "heavily"

12   on expert testimony, and stating: "[e]xtrinsic evidence, such as expert testimony, may be useful in

13   claim construction, but it should be considered in the context of the intrinsic evidence").  Further,

14   much of Dr. Blanchard's declaration is simply technically inaccurate, as explained by AOS's

15   expert, Dr. C. Andre T. Salama in a declaration being filed concurrently with this brief.

16        In contrast, AOS proposes constructions that are rooted firmly in the claim language,

17   specifications and prosecution histories.  The prosecution history is particularly relevant to

18   construction of the five Fairchild patents that are all based on the application filed in November

19   1997 by Brian Sze-Ki Mo because the five resulting "Mo patents" were issued only after years of

20   rejections and amendments by and between the applicants and the U.S. Patent Office.[1]  A

21   principal focus of the battle between the applicants and the PTO was the very terms now at issue

22   in this litigation, including the key term "abrupt junction."  All of this prosecution history is

23   binding on Fairchild.  *See Springs Window Fashions LP v. Novo Indus.*, L.P., 323 F.3d 989, 995

24   (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a

25   patentee be held to what he declares during the prosecution of his patent").

26        Of the six terms to be construed with respect to the Fairchild patents-in-suit, three relate to

27   the Mo patents and the other three relate to U.S. Patent No. 6,818,947 ("the '947 patent").

28
___
[1] U.S. Patent Nos. 6,429,481; 6,521,497; 6,710,406; 6,828,195; and 7,148,111.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    Although Fairchild's proposed constructions for the terms relating to the '947 patent purport to be

2    based more on the intrinsic evidence than its constructions for the Mo patents, the intrinsic

3    evidence does not actually support Fairchild's proposed constructions here either.  Rather, as

4    demonstrated below, the intrinsic and extrinsic evidence supports AOS's proposed constructions

5    of the three terms relating to the '947 patent.

6    **II.**    **BACKGROUND**

7        **A.**    **The Mo Patents**

8            1.    **The Purported Invention**

9        The Mo patents purport to describe and claim a method for protecting a power MOSFET

10   device from the effects of a phenomenon known as "avalanche breakdown."  Avalanche

11   breakdown is an unwanted process that occurs when a sufficiently high voltage is applied to a

12   MOSFET, creating electric fields strong enough to cause a moving electron to break others free,

13   resulting in an uncontrollable cascade of electrical current through the MOSFET even when it is

14   switched off.  *See* Declaration of C. Andre T. Salama, submitted herewith ("Salama Opp. Decl."),

15   ¶ 4.  The moment when an electron first breaks free and begins the avalanche process is called

16   "breakdown initiation."  *Id.* at ¶ 5.  The point where this process begins is called the "breakdown

17   initiation point."  The breakdown initiation point will be found where the electric fields are

18   strongest, that is, at the "peak electric field."  *Id.*  If increasing voltage is applied to the device,

19   breakdown can spread rapidly among the cells; within each cell, breakdown can start at one point

20   in the cell, and then, as the voltage is increased, spread to other parts of the cell.  *Id.* at ¶ 6.  If

21   enough voltage is applied after breakdown initiation, current-paths can form through any number

22   of undesired pathways within the transistor.  *Id.*  Avalanche breakdown can damage the gate

23   oxide layer covering the interior surface of the gate trenches.  *Id.* at ¶ 4.

24       To prevent avalanche breakdown from damaging the gate oxide, the prior art taught

25   techniques for controlling where in the device breakdown initiation occurs.  *See* Declaration of

26   Yalei Sun submitted herewith ("Sun Decl.")*,* Ex. 1, '481 patent, at col. 1:15-21.  According to the

27   Mo specification, this was typically done by having the bottom of the heavy body structure

28   deeper than the bottom of the gate trench in the substrate so as to move the breakdown initiation

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    point near the bottom of the heavy body and away from the bottom of the gate trench. *Id.*

2         The Mo patents purport to claim a different method for moving the breakdown initiation

3    point: the creation of a so-called "abrupt junction" between the heavy body and the well in each

4    transistor cell. According to the teaching of the patents, the depth of the "abrupt junction" must

5    be "adjusted" so that peak electric field is induced near the abrupt junction, thereby moving the

6    breakdown initiation point away from the gate trench. *Id.* at col. 2:34-37.

7              2.    **The Prosecution History.**

8         Although the application for the Mo patents was filed on November 14, 1997, no claims

9    were issued until August 6, 2002. During almost five years of prosecution, the Examiner rejected

10   all of the proposed claims at least four times as either anticipated by or unpatentable over prior

11   art. The applicants ultimately persuaded the Examiner to issue the patents based on constructions

12   of the key term "abrupt junction" and the "adjusting" element that the Court is now called upon to

13   construe. To persuade the Examiner to issue the patents, the applicants relied almost exclusively

14   on definitions and explanations provided in the textbook "Physics of Semiconductor Devices" by

15   S.M. Sze ("the Sze book"). Sun Decl. Ex. 14. Therefore, this reference – ignored by Fairchild in

16   its opening brief – is a particularly relevant guide to construction of the disputed claim terms. *See*

17   *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1363 (Fed. Cir. 1998) (holding a patentee to

18   the definition of a term in a journal article when the patent applicant cited the article to explain

19   the term).

20        **B.    The '947 Patent.**

21        The '947 patent purports to claim a method for reducing the number of elements needed to

22   make a power transistor by combining a gate runner and a field plate into one structure. '947

23   patent at col. 2:42-47. As described in the background section of the '947 patent, one of the

24   factors limiting a power MOSFET's performance is the low breakdown voltage in the termination

25   region of the device. '947 patent at col. 1:29-31. The "termination region" of a power MOSFET

26   is the portion of the die surrounding the active region of the device, generally on the periphery of

27   the device. Salama Opp. Decl. ¶ 7. The termination region includes termination structures (*e.g.*,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  field plate, channel stop, and field ring). *Id.* These termination structures help to increase a

2  power MOSFET's breakdown voltage by modifying the "depletion layer" between the body and

3  the drain in the termination region. *Id.* In the termination region, the depletion layer curves

4  around the end of the p-type well. Salama Opp. Decl. at ¶ 8. The curvature of a depletion layer

5  affects the termination region's breakdown voltage: generally, the higher the depletion layer

6  curvature the lower the breakdown voltage, and *vice versa*. *Id.*

7      The prior art taught several techniques for avoiding high depletion layer curvatures. '947

8  patent, col. 1:31-34. Edge termination structures, such as field rings, channel stop implants, and

9  field plates, were used. *Id.* at col. 1:34-39; *see also* Salama Opp. Decl. ¶ 9. The prior art also

10 taught the use of trenched field plates for this purpose. '947 patent, col. 1:52-54.

11      According to the '947 patent, prior art techniques did not utilize the substrate surface

12 efficiently because field plate and gate runner structures[2] were allegedly two separate structures in

13 the termination region. '947 patent at col. 5:35-36. The invention of the '947 patent was a

14 purportedly improved edge termination design that combines the field plate and the gate runners

15 into one trenched structure. *Id.* at col. 2:42-47.

16 **III.    INTERPRETATION OF DISPUTED TERMS**

17      **A.    The Mo Patents ('481, '406, '497, 195, and '111)**

18      One of the key terms to be construed from the Mo patents is the term "abrupt junction."

19 AOS contends the term is indefinite and that this indefiniteness is a fatal defect that invalidates

20 the '481, '406, and '195 patents.[3]

21      The term "abrupt junction" is indefinite because it is used in the specification of the Mo

22 patents to describe an electrical transition between a heavy body structure and a well of the <u>same</u>

23 <u>conductivity type</u> (*see*, e.g., '481 patent, at col. 5:26-28). However, the prosecution history shows

24 that the applicants were using the term in the more commonly understood way: to describe an

---

[2] Power MOSFETs typically have a gate runner that rings the periphery of the device. Additional gate runners may also extend in a straight line across the active region of a MOSFET, such as those the parties discuss with regard to AOS's '567 patent.

[3] Although Fairchild asserts that AOS waived this defense, AOS properly identified this defense in its Supplemental Patent L.R. 3-3 Disclosure. Sun Decl., Ex. 25 at 204, 207, and 209 (identifying AOS's indefiniteness defense based on "abrupt junction"). AOS's original Patent L.R. 3-3 Disclosure also identified AOS's indefiniteness defense. Sun Decl., Ex. 28 at 207-209.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

electrical transition between different portions of the transistor of <u>opposite</u> conductivity types, which is a p-n junction. *See* Sun Decl., Ex. 1 ("June 7, 2001 Response") at 5-7 (citing portions of the Sze book discussing abrupt p-n junctions). Because the prosecution history suggests the inventors meant one thing when they used the term "abrupt junction" and the specification for the Mo patents suggests they were using it to claim something very different, the claims are indefinite. *See* Salama Opp. Decl. ¶ 15.

"There is some ambiguity in the case law as to whether a finding of indefiniteness should occur during claim construction, or whether it should occur at a later step." *ASM America, Inc. v. Genus, Inc.*, 2002 WL 1892200, *15 (N.D.Cal. 2002). Courts in this district have resolved this ambiguity by at least attempting to construe allegedly indefinite terms, and later entertaining dispositive motions based on invalidity. Accordingly, AOS has proposed a construction for the term "abrupt junction" without waiving its right to move for summary judgment later on indefiniteness or other grounds.

       1.    **The Court Should Reject Fairchild's Proposed Definition Of The Term "Abrupt Junction" And Adopt AOS's Proposed Definition**

The dispute regarding the term "abrupt junction" is as follows:

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| wherein the heavy body forms an abrupt junction with the well | the doping concentration gradient at the junction between the heavy body and the well is sufficiently high that further increasing the doping concentration gradient does not further reduce the breakdown voltage between the well and the substrate.<br><br>A linearly graded junction is not an abrupt junction. | The transition between the heavy body and the well occurs over a short distance relative to the depth of the well. |

As discussed below, AOS's proposed construction is mandated by the statements of the inventors during the prosecution history, and is well-supported by other intrinsic evidence.

       a.    **AOS's Proposed Construction Is Based Squarely On The Definition Used By The Inventors To Obtain The Patents, And Is Otherwise Consistent With The Claim Language And Specifications**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In response to a rejection by the Examiner, the inventors of the Mo patents stated "[t]he details of the <u>definition</u> and structural properties of the <u>abrupt junction</u> versus the <u>linearly graded junction</u> were previously provided in the 6/7/01 response at pages 5-7, and will not be repeated." Sun Decl. Ex. 12 ("Dec. 31, 2001 Amendment") at 2.[4]  In their June 7, 2001 response to the Examiner, the inventors defined "abrupt junction" as follows:

> Accordingly, referring to Fig. 31 of Sze (reproduced above for convenient reference), for a given background doping $N_B$, <u>the breakdown voltage $V_B$ is lowered (parallel lines) as the impurity gradient $a$ increases until it comes to a limit at the point (on the bottom line) where the impurity gradient $a$ reaches an abrupt junction</u>, after which $V_B$ [breakdown voltage] remains constant.

Sun Decl., Ex. 11 ("June 7, 2001 Response") at 7.  In other words, as the dopant concentration gradient $a$ increases, the breakdown voltage is lowered, until the gradient comes to a limit where the breakdown voltage will go no lower – at that point, the gradient has reached an abrupt junction.  Simply paraphrasing this statement, AOS's construction requires that the doping concentration is "sufficiently high that further increasing the doping concentration gradient does not further reduce the breakdown voltage."

AOS's construction that "an abrupt junction is not a linearly graded junction" is likewise drawn squarely from the prosecution history.  In the same June 7, 2001 response, the inventors discussed "two limiting cases: the abrupt and the linearly graded junction." *Id.* at 5-6 (quoting Sze).  The inventors referred the Examiner to "a detailed analysis of the characteristics of the 'abrupt' junction versus the 'linearly graded' junction." *Id.* at 6.  The inventors then quoted a discussion from Sze providing an equation for the breakdown voltage of an abrupt junction and an equation for a linearly graded junction.[5]  *Id.*  In light of these repeated and unambiguous distinctions between an abrupt junction and a linearly graded junction, an "abrupt junction" cannot be construed to encompass a linearly graded junction.  For the same reasons, Fairchild's

---

[4] Throughout this brief, any emphasis in quoted material was added to the original text unless indicated otherwise.

[5] The abrupt junction discussed in the Sze book is a P-N junction between semiconductor materials of opposite conductivity types, not a junction between semiconductor materials of the same conductivity type.  The Sze book's definition of a P-N abrupt junction is indeed widely accepted by scientific literature and technical dictionaries.  The junction between the "heavy body" and the "well" in the Mo patents, however, is not a P-N junction.  It is called a high-low junction.  Unlike a P-N junction, there is no avalanche breakdown at a high-low junction. *See, e.g.,* Salama Opp. Decl. ¶¶ 10, 14. *See also* Sun Decl. Exs. 15 – 18.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    current suggestion that AOS's construction is unclear because of purported confusion as to what

2    constitutes a linearly graded junction must be rejected – the inventors expressly identified and

3    distinguished both types of junctions in the prosecution history.  *See* Fairchild's Opening Claim

4    Construction Brief ("Fairchild Br.") at 10:1-5.  Indeed, even if AOS's construction based on Sze

5    were not the ordinary meaning of "abrupt junction," it would still be the proper construction

6    because the inventors acted as their own lexicographer during the prosecution.  *CCS Fitness, Inc.*

7    *v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("the claim term will not receive its

8    ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition

9    of the disputed claim term in either the specification or prosecution history").

10                b.       **Fairchild's Proposed Construction Is Inconsistent With The
                            Prosecution History And The Other Intrinsic Evidence**

11

12               Not only does Fairchild's proposed construction fail to recognize the inventors' express

13    definition of "abrupt junction" in the prosecution history, but it fails to account for the two

14    specific factors that determine whether a junction is linearly graded or abrupt.  In an Oct. 18,

15    2001 amendment, the inventors stated that "whether a junction is linearly graded or abrupt

16    depends on several different but inter-dependent variables including background doping

17    concentration, target breakdown voltage, etc. as explained by Sze."  Dec. 31, 2001 Amendment at

18    3.  The inventors reiterated this list a few years later in an appeal brief for another Mo application:

19    "Sze explains that whether a junction is abrupt or linearly graded depends on a number of

20    different but interdependent variables, including background doping concentration, target

21    breakdown voltage, etc."  Sun Decl. Ex. 13 ("Appeal Brief") at 8.

22               AOS's proposed definition includes both of these factors, but Fairchild's proposed

23    definition includes neither.  AOS's definition includes these factors because they are an inherent

24    part of the proposed construction:  "further increasing the <u>doping concentration</u> gradient does not

25    further reduce the <u>breakdown voltage</u> between the well and the substrate."  To the extent

26    background doping affects the breakdown voltage, the test incorporates the factors identified by

27    the inventors.

28               These two factors that identify abrupt junctions are conspicuously lacking from

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

Fairchild's proposed definition.  Significantly, both Fairchild's opening brief and the accompanying Blanchard Declaration are bereft of *any* supporting citation to the critical intrinsic evidence of the Mo patents.  Fairchild has completely ignored the extensive prosecution history canvassed here.  While Fairchild and Blanchard reference Figure 5 from the '481 patent, they have added annotations for purposes of this litigation purporting to identify the "abrupt junction."  In essence, Fairchild is attempting improperly to manufacture intrinsic evidence where there is none supporting its claim construction.

          c.      **Other Problems With Fairchild's Proposed Claim Construction And Supporting Argument**

There are many other problems with Fairchild's proposed construction of the term "abrupt junction."

*First,* Fairchild improperly uses the prosecution history.  *See* Fairchild Br., at 8:2-12.  Fairchild relies on an early statement made by the inventors during prosecution that the Examiner found unpersuasive.  The claims were rejected again and again, and were not issued until the inventors had made the statements in, *inter alia,* the June 7, 2001 Response and the Dec. 31, 2001 Amendment distinguishing an abrupt junction from a linearly graded junction, and providing the other purported characteristics of an abrupt junction based on Sze.  Having relied on the Sze text during prosecution to establish the structure and functionality of an abrupt junction, Fairchild cannot now disclaim it.

*Second*, Fairchild's proposed construction would require comparing the transition distance from the heavy body to the well with the depth of the well.  That comparison is both scientifically irrelevant and unsupported by the intrinsic evidence.  In particular, neither Fairchild's opening claim construction brief nor Dr. Blanchard's declaration explain why the proposed comparison would be relevant to identify an abrupt junction or how any intrinsic evidence would support making the comparison.

Whether a junction is abrupt or linearly graded depends on the steepness of the gradient at the junction, not the depth of the junction below the surface.  There is no support in the intrinsic evidence for Fairchild's proposed comparison.  Moreover, one of skill in the art would not

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  understand that comparison to be useful in identifying whether a junction is abrupt or not.

2  Salama Opp. Decl., ¶ 12.

3      *Third*, Fairchild's proposed construction incorrectly identifies the "transition," *i.e.*, the

4  junction, between the heavy body and the well.  Dr. Blanchard presents an analogy that is

5  illuminating in the sense that it reveals the problem with *Fairchild's* proposed definition.  Dr.

6  Blanchard says the transition between two regions in a semiconductor device is like the transition

7  between a street and a sidewalk.  *See* Blanchard Decl., ¶ 34.  The transition is abrupt if there is a

8  curb, but linearly graded if there is a ramp.  *Id.*

9      Having provided an apt analogy, Dr. Blanchard and Fairchild fail to apply it.  The

10  inventors explained the "abrupt transition" between the heavy body and the well referring to

11  Figure 5 of the patent:

12      Notice that the peak p+ heavy body is at a predetermined depth in the p-well and
       changes rapidly in a short further depth (i.e. has a <u>steep doping concentration</u>
13     <u>gradient</u>) to form the abrupt transition with the p-well.

14  Sun Decl. Ex. 9 ("Sept. 5, 2000 Amendment") at 8.  This is shown in the modified version of

15  Figure 5 from the '481 patent, shown below on the left.  In this figure, the vertical axis represents

16  the doping concentration, while the horizontal axis indicates the depth.  The portion of the heavy

17  body with the highest doping concentration is labeled "Peak p+ heavy body."  The abrupt

18  junction, shown in the green rectangle, is the change in doping concentration over the short

19  distance between the peak p+ heavy body and the p- well.  In Dr. Blanchard's analogy, the heavy

20  body is the sidewalk, the well is the street, and the junction between them is "abrupt" if it is steep

21  enough to be a curb, rather than a ramp.

22      In contrast, Fairchild (relying exclusively on Dr. Blanchard's declaration) now identifies a

23  different and smaller portion of the gradient as the "abrupt junction."  This is shown in the figure

24  on the right below:

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)



Fairchild and Dr. Blanchard incorrectly identify the "transition" as a "corner" (with "an abrupt change in slope over a short distance where the transition occurs") in the figure from the '481 patent. Blanchard Decl ¶ 35, 38. In contrast to his own analogy, Dr. Blanchard is now judging whether the junction is abrupt based on whether there is a "corner" between the ramp and the street, rather than whether the ramp is steep enough to be a curb. That methodology is contrary to both the prosecution history and Dr. Blanchard's own analogy, and should be rejected. Salama Opp. Decl. ¶ 11.

*Fourth*, Fairchild's proposed claim construction provides no objective measure of what constitutes an abrupt junction and therefore would only exacerbate the existing indefiniteness problem with the Mo patents. The phrase "short relative to the depth of the well" is subjective and would not provide sufficient information to a person of ordinary skill in the art regarding the meaning of the claims using the term. Salama Opp. Decl., ¶ 12.

2.    **The Court Should Adopt AOS's Proposed Construction Of The Disputed Phrase "Resulting In Avalanche Current That Is Substantially Uniformly Distributed"**

The parties dispute the following term from claim 29 of the '111 patent:

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| resulting in avalanche current that is substantially uniformly distributed | The avalanche current at breakdown initiation is roughly uniformly distributed across the entire device | Resulting in avalanche current that is approximately evenly distributed across the active region of the device |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1

2

3

        a.      **Because Structures In The Termination Region Draw Avalanche Breakdown Current Away From The Active Region Of The Device, The Uniform Distribution Of Avalanche Current Must Include The Termination Region**

AOS's proposed definition, which requires uniform distribution of avalanche current across the entire device, *i.e.*, the active and termination regions, is supported by the claim language. *First,* the preamble to claim 29 states that it is a method of manufacturing a trench transistor. Sun Decl., Ex. 5 ("the '111 patent") at col. 10:45 – col. 11:10. Since a transistor has both an active region and a termination region, the method applies to avalanche current in both regions. *Second,* the claim language "uniformly distributed" implies that it involves all of the avalanche current. *Third,* there is no language in the claim that expressly limits the location of avalanche current to anything less than the entire device.

AOS's proposed construction also is supported by the specification. While the claims are not limited to the preferred embodiments of the specification, "claims must be read in view of the specification, of which they are a part." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (citation omitted); *see also Markman v. Westview Instruments,* , 517 U.S. 370, 371-73 (1996). Further, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips,* 415 F.3d at 1316.

The specification states that the avalanche current is drawn from the active region to the periphery:

> the cell array is surrounded by a field termination junction 40 which increases the breakdown voltage of the device and draws[6] avalanche current away from the cell array to the periphery of the die.

'111 patent, col. 5:34-37. As shown in Figure 2 of the '111 patent, the field termination junction 40 is in the termination region of the transistor. Because some of the avalanche current flows through the termination region, the "uniform distribution" of avalanche current must include the termination region.

---

[6] In the '111 patent, this was mistranscribed as "thaws."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

b. **The Patent Supports The Portion Of AOS's Proposed Construction That Requires The Measurement Of Breakdown Current At Breakdown Initiation**

While AOS proposes that the avalanche current must be substantially uniformly distributed at the time of breakdown initiation, Fairchild contends that the distribution need not be uniform at any specific time. *See* Fairchild Br. at 11. But to determine if the current is substantially uniform, one must pick a time at which to measure it.

The patent makes clear that the time at which the avalanche current should be measured is the time of breakdown initiation. The claim element recites:

> adjusting a dopant profile of the plurality of heavy body regions so that peak electric field is moved away from a nearby trench toward the heavy body resulting in avalanche current that is substantially uniformly distributed.

Sun Decl. Ex. 5 ('111 patent) at claim 29 (col. 11:6-10). The specification explains that moving the peak electric field to the junction between the heavy body and the well is related to the initiation of "avalanche multiplication":

> an abrupt junction at the interface between the p+ heavy body and the p-well causes the peak electric field to occur in that area of the interface. Avalanche multiplication initiates at the location of the peak electric field, thus steering hot carriers away from the sensitive gate oxide and channel regions.

*Id.* at col. 5:22-27. "Initiation" is a reference to a specific point in time: the time of breakdown initiation. The specification does not discuss moving the peak electric field in connection with breakdown at any point in time other than breakdown initiation.

Further, the inventors emphasized the importance of "breakdown initiation" during the prosecution history. For example, the inventors said "[t]he foregoing summaries of both the present invention and Hshieh reveal that a common problem addressed by both relates to moving the point of breakdown initiation away from the vicinity of the transistor's trench(es)." Sun Decl. Ex. 9 ("Sept. 5, 2000 Amendment") at 9. In the June 7, 2001 Response, the inventors said that "[a]pplicants are entitled to claim this structural aspect of the present invention (*i.e.*, relative depths of the heavy body and the well), that is also further defined functionally (impacting breakdown initiation point)...." In fact, the prosecution history of the first Mo patent refers to "breakdown initiation" 18 times. Sun Decl. Exs. 7 – 12. Conversely, there are no statements in the prosecution history that suggest measuring avalanche breakdown at any time other than

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

breakdown initiation.

Moreover, AOS's construction is required for the claim to make technical sense. The uniform distribution of avalanche current must be a result of <u>adjusting the dopant profile</u>, and measuring the uniform distribution at any time after breakdown initiation would vitiate this limitation. *See* '111 patent at claim 29 (col. 11:7-11). After initiation of breakdown, if higher and higher voltage is applied to the device, further breakdown will occur. *See* Salama Opp. Decl., ¶ 6. For example, if breakdown were to initiate at the edge of the trench, increasing the voltage could cause a subsequent breakdown at the junction between the heavy body and the well. *Id.* at ¶¶ 5, 6. If the applied voltage is high enough, breakdown could occur at the junction between the heavy body and the well, regardless of the doping profile and regardless of whether the device employs the purported invention of the Mo patents. *See id.* Accordingly, if the breakdown recited in the claim refers to breakdown <u>subsequent to initiation,</u> the claim element could encompass any dopant profile. *See id.* at ¶ 5. Breakdown could occur practically anywhere in the device if higher and higher voltage is applied subsequent to the initiation of breakdown, so the dopant profile would not affect the distribution of avalanche current. *See id.* at ¶ 5. For this reason, among others, one of skill in the art would be concerned with avalanche current at breakdown initiation, not some subsequent breakdown. *Id.*

### 3. The Term "Adjusting" Must Be Construed, And The Court Should Adopt AOS's Proposed Construction

Fairchild argues this term need not be construed – despite the plethora of evidence in the prosecution history bearing on the proper construction of the limitation. AOS's proposed construction is consistent with this prosecution history and the other intrinsic evidence.

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| depth of the junction, relative to the depth of the well, is adjusted so that a transistor breakdown initiation point is spaced away from the trench in the semiconductor when voltage is applied to the transistor | selecting by repeated experiments or by computer simulation the relative depths of the well and the junction for the purpose of moving initiation of breakdown in the device toward the center of the body region between adjacent trenches | Fairchild does not believe construction of this term is required. The ordinary meaning should apply. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

a.    **The Claim Language, Specification, And Prosecution History Require That "Adjusting" Be Performed With The Intent To Affect The Peak Electric Field**

The intrinsic record establishes the causal relationship between "adjusting" and the result. *First*, the specification uses the word "selected" to identify a process to be performed on the relative depths of the heavy body and well.  The specification states that the relative depth "is selected so that the peak electric field…" '481 patent, col. 2:29 – 32, 59 – 62; col. 5:8 – 12.  The selection of the relative depths must <u>cause</u> the movement of the peak electric field.

*Second*, the prosecution history relieves any doubt about the required nexus.  During prosecution, Fairchild consistently pointed out the causal relationship between the depths of the heavy body and well, on the one hand, and the breakdown initiation point, on the other.  *See, e.g.*, June 7, 2001 Response at 16 (the depth "is adjusted to impact the location of breakdown initiation").

The limitation of "adjusting" the relative depths of the heavy body and well was one of the inventors' two key arguments for patentability.  Dec. 31, 2001 Amendment at 2 – 6.  The inventors distinguished their application over the prior art based on the purpose of the "adjusting" operation.  When the inventors first added the "adjusting" limitation (initially using the verb "controlled"), they emphasized the purpose requirement to distinguish over the '120 patent to Hshieh[7] prior art reference:

> Hshieh's "P+ doped body contact region 18" is just that, a contact region. That is, the sole <u>purpose</u> of the "P+ doped body contact region 18" is "to promote electrical contact between the body region 14 and the overlying source-body metallization 30." [Hshieh '128, col. 3, lines 38-40].  Hshieh's contact region 18 is therefore relatively shallow and <u>is not intended</u> to impact the location of "the peak electric field" that may cause destructive breakdown when voltage is applied to the transistor. Amended claim 1, <u>in contrast</u>, defines the "doped heavy body" as having a depth that <u>"is controlled so that the peak electric field, when voltage is applied to the transistor, will be spaced from the trench."</u>[8]

Sun Decl., Ex. 8 ("Nov. 9, 1999 Amendment") at 8.  In other words, to obtain the Mo patents, the inventors explained that the depth of their heavy body was controlled to achieve a particular purpose.

---

[7] Hshieh is an inventor on many patents, including the '776 and '630 patents asserted by AOS.
[8] On June 7, 2001, the inventors amended the claims to replace "controlled" with "adjusted." June 7, 2001 response at 9, 17, 18.  Fairchild does not ascribe any significance to this change.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    The inventors affirmed the requirement for purposeful action in subsequent

2    communication with the Patent Office.  To distinguish the application from U.S Patent No.

3    5,629,543, the inventors argued:

> Besides failing to teach that the p+ body contact region/body region junction is
> abrupt, it should be emphasized that there is nothing in Hshieh that teaches or
> suggests that the junction between these two regions is of a controlled depth <u>for
> the purpose of</u> localizing the point of breakdown initiation within the device.

6    Sun Decl. Ex. 9, (Sept. 5, 2000 Amendment) at 9.  Five years later, the inventors continued to

7    emphasize the requirement of purposeful action in an appeal brief for a Mo continuation.  To

8    argue for patentability based on the "adjusting" limitation, the inventors stated:

> To be clear, claims 47, 69, and 98 recite that the "location of the abrupt junction"
> <u>is adjusted for the recited purpose</u> and one of skill in the art would readily
> understand that this is accomplished during fabrication.

11   Appeal Brief at 15.

12       The Federal Circuit enforces claim language where patent applicants have drafted claims

13   that require purpose or intent.  In *Koito Mfg Co., v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1145

14   (Fed. Cir. 2004), a patent limitation required a "predetermined" flow direction.  The Federal

15   Circuit affirmed the district court's construction that "predetermined" required intent or

16   foreknowledge to establish the flow direction.  *Id.* at 1150.  In *Combined Sys. v. Def. Tech. Corp*

17   *of America*, 350 F.3d 1207, 1208 (Fed. Cir. 2003), a patent limitation required "forming folds."

18   Relying on the claim language and specification, the Federal Circuit affirmed the district court's

19   construction that "forming folds" required the "deliberate and systematic creation of folds."  *Id.* at

20   1209, 1214.  Incidental "gathers" that occurred as part of the processing did not constitute

21   "forming folds" because there was no deliberate action.  *Id.* at 1214.

b.    **"Adjusting" Involves Repeated Experiments Or Computer Simulation**

24       Fairchild wrongly accuses AOS of interpreting the term "adjusting" by using a "wholly

25   fabricated phrase 'selecting by repeated experiments or by computer simulation.'"  Fairchild Br.,

     at 14:15-22.

26       AOS's proposed construction is based squarely on the specification.  The specification

27   describes two ways to perform the "adjusting" operation: "[t]he preferred relative depths of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    p+ heavy body, the p- well and the trench are different for different device layouts.  However,

2    preferred relative depths can be readily determined <u>empirically</u> (by observing the location of peak

3    electric field) or by <u>finite element analysis</u>."  '481 patent, col. 5:12-17.  "Repeated experiments"

4    is a proper definition for empirical observations, and finite element analysis is one form of

5    computer simulation.  *See* Sun Decl. Ex. 26 (definition of finite element analysis from

6    Wikipedia).  Fairchild has proposed no other way to select the relative depths of the heavy body

7    and well and the patent does not provide support for any other method.

8            c.    **Moving The Breakdown Initiation Point <u>Away From The</u>**
9                  **<u>Trench</u> Should Be Interpreted To Mean <u>Toward The Center</u> Of**
                   **The Body Region Of The Device**

10           Under AOS's construction, breakdown initiation is moved "<u>toward</u> the center of the body

11   region."  Within the active region of a trenched power MOSFET, moving away from trench is the

12   same as moving toward the center between trenches.

13   The simple generic diagram to the right illustrates the

14   point.



15           Again, the specification supports AOS's

16   construction.  The specification of the '481 patent identifies only one location for the movement

17   of the peak electric field: between adjacent trenches in the active region.  The relative depth of the

18   two regions "is selected so that the peak electric field when voltage is applied to the transistor will

19   be <u>approximately halfway between adjacent trenches</u>."  '481 patent, col. 5:8 – 12.

20           Apparently, Fairchild intends to interpret "away from the trench" as including movement

21   into the termination region.  The proper construction of "away from the trench" in the disputed

22   phrase must exclude movement into the termination region.  Fairchild's expert, Dr. Blanchard,

23   acknowledges this:

24           it is the location of the heavy body regions between the trenches (and spaced apart
             from the trenches) that causes the peak electric field likewise to be located away
25           from the trenches…The claimed invention causes the peak electric field to be
             <u>centrally located beneath each heavy body region, which is located between</u>
26           <u>adjacent trenches</u>.

27   Blanchard Decl. ¶ 43.

28           To justify its overbroad construction, Fairchild misapplies the doctrine of claim

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  differentiation, arguing that under AOS's construction, there would be "virtually no difference"

2  between claim 13, which recites the breakdown origination point "spaced away" from the

3  trenches, and claim 15, which recites the breakdown origination point "approximately halfway

4  between adjacent gate-forming trenches."  Fairchild Br. at 16:12-26; Sun Decl. Ex. 2 ('406

5  patent), claim 13 and 15.  But AOS's construction of "toward the center" of the body region is not

6  coextensive with "approximately halfway between the trenches."  The breakdown origination

7  could be toward the center, but not halfway or even approximately halfway between the trenches.

8  Since there would still be a difference between the claims under AOS's construction, the doctrine

9  of claim differentiation does not apply.

d.    **The Court Should Reject Fairchild's Attempt To Eliminate The "Adjusting" Limitation From The Claims**

Fairchild provides no independent meaning for the term "adjusted."  Instead, in

Fairchild's view, the "adjusted" limitation is met if the breakdown initiation point is spaced away

from the trench –without more.  *See* Fairchild Br., at 13-14.  This is tantamount to reading the

limitation out of the claim improperly, making it easier for Fairchild to establish infringement.[9]

Of course, the law does not authorize Fairchild's approach.  The phrase "adjusting the relative

depths" must mean something more than "existing."  *See*, *e.g., Innova/Pure Water, Inc. v. Safari

Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (holding that all claim terms are

presumed to have meaning in a claim).  As explained above, the specification identifies that

adjusting involves selection by repeated experiments or computer simulation.

**B.    The '947 Patent**

The '947 patent teaches combining a gate runner and a field plate into one structure in the

termination region of a power MOSFET.  Allegedly, this combination conserves space in the

substrate of the power MOSFET.  Sun Decl. Ex. 6 ("the '947 patent"), at col. 2:42-48.

1.    **The Court Should Reject Fairchild's Obvious Attempt To Broaden**

---

[9] This is not merely speculation on AOS's part.  In Fairchild's Preliminary Infringement
Contentions, Fairchild accuses all AOS devices of infringing the '481 patent because "the depth
of this abrupt junction relative to the depth of the well is such that the peak electric field causes
the breakdown initiation point to be spaced away from the trench."  For example, see Exhibit 2 of
Fairchild's Preliminary Infringement Contentions that accuse AOS device AO4812.  Sun Decl.
Ex. 27.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

**The Meaning Of The Term "Acting As A Field Plate" And Adopt AOS's Proposed Construction.**

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| Acting as a field plate to extend the device breakdown voltage in the termination region.<br><br>Acts as a field plate termination.<br><br>Forming a field plate around the transistor regions. | A conductive ring formed in a trench in the termination region, resulting in a higher breakdown voltage in the termination region by modifying the depletion layer in the underlying silicon. | Acting as a conductive structure at or near the top surface of the substrate to increase breakdown voltage in the termination region.<br><br>Forming a conductive structure at or near the top surface of the substrate that increases breakdown voltage in the termination region. |

        a.     **The Claims And Specification Require That The Conductive Ring Must Be Formed Completely In A Trench.**

Each of the asserted independent claims of the '947 patent explicitly requires that the structure acting as a field plate be within a trench. For example, claim 5 requires:

> forming first and second conductor regions such that said first and second conductor regions are electrically connected to form a continuous conductor with multiple regions and said first conductor regions is in said trenched transistor formation and said <u>second conductor region is said trenched gate runner</u> such that said <u>second conductor also acts as a field plate termination</u>.

'947 patent at col. 7:9-16; *see also id.* at col. 6:31-34 (claim 1: "a feed comprising conductive material formed in a <u>trench</u> ... acting as a <u>field plate</u>"); col. 8:1-5 (claim 6: "a <u>trench</u> having an outer annular portion ... filled with conductive material for forming a <u>field plate</u>").[10]

The specification provides further support for AOS's proposed construction. It says: "A feature of the invention is provision of one <u>trenched</u> conductor to serve as both a field plate and a gate runner to the several MOS cells in a device structure." '947 patent at col. 4:43-46. The specification "is the single best guide to the meaning of a disputed term." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

---

[10] While AOS's construction refers to "conductive rings," Fairchild's construction encompasses "conductive structures." A field plate is only one of several structures used in the industry to increase breakdown voltage in the termination region. Other structures include, field rings, channel stop implants and other designs. *See* '947 patent at col. 1:34-36. On its face, the claims cover only "field plates" – not any of these other structures. *See id.* at 6:34-35; 7:14-15; and 8:4-6. Thus, Fairchild's attempt to broaden the scope of the claims to include other conductive "structures" besides field plates must be rejected.

MORGAN, LEWIS &<br>BOCKIUS LLP<br>ATTORNEYS AT LAW<br>SAN FRANCISCO

1    In a transparent attempt to broaden the scope of its asserted claims, Fairchild suggests the

2    field plate need only be located "at least partially within a trench."  Fairchild Br., at 20:22-24.

3    This is the purpose of the "at or near the top surface of the substrate" portion of Fairchild's

4    proposed construction.  Argument supporting Fairchild's proposed interpretation is contained

5    improperly in Dr. Blanchard's declaration.  *See* Blanchard Decl., ¶51.

6    The claim language itself defeats Fairchild's proposed construction.  According to

7    Fairchild, the structure that acts as a field plate includes both the conductive material (64) and the

8    contact area (68) in the trench (60) depicted in the figure to the right.[11]  *See*

9    Fairchild Br. at 19:2-11.  Because the contact area (68) extends out of the

10   trench, Fairchild contends the field plate does not lie completely within the

11   trench.  However, the '947 patent teaches that the conductive material 64

12   *alone* acts as a field plate.  Claim 1 recites a "second conductor portion" including "a contact,"

13   i.e., contact 68, and "a feed comprising conductive material formed in a trench," i.e., conductive

14   material 64.  '947 patent at 6:27-31.  The claim then clearly states that *only* the feed comprising

15   conductive material – area 64 – acts as a field plate.[12]  *See id.* at col. 6:30-35.[13]  The specification

16   further undermines Fairchild's proposed construction:  consistent with the claim language, the

17   specification says that "the underlined trenched conductive material 64 extends along the die edge 52 to

18   provide a underlined field plate termination."  *Id.* at col. 4:33-35.  The contact 68 serves only to connect the

19   gate voltage supply to the conductive material, *id.* at col. 4:36-38, and, per the claim language and

20   the specification, is not part of the structure acting as the "field plate."

    b.   **The Field Plate Must Modify The Depletion Layer In The Underlying Silicon.**

    The invention claims a conductive feed that "acts as a field plate."  To describe a field

    plate, the specification incorporates by reference the textbooks Modern Power Devices (the

---

[11] This is a colorized portion of Figure 1 of the '947 patent.

[12] During prosecution, the inventors amended claim 1 to move the phrase "acting as a field plate" into the paragraph describing a feed comprising conductive material (i.e., area 64).  *Compare* Sun Ex. 23, at 2, *with* Sun Ex. 24, at 2:14-18.

[13] While neither claim 5 nor claim 6 addresses the distinction between the conductive material 64 and the contact 68, terms should be construed consistently across claims.  *See Phillips*, 415 F.3d at 1314.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1    "Baliga text") and Semiconductor Power Devices (the "Ghandhi text"), and refers to U.S. Patent

2    No. 5,233,215 (the "Baliga patent").[14]  *See* '947 patent at col. 1:45-59.  Material incorporated by

3    reference into the specification becomes part of the specification, and thus part of the intrinsic

4    record.  *Grantley Patent Holdings, v. Clear Channel Commc'ns, Inc.*, 2008 U.S. Dist. LEXIS

5    1588, *17 (E.D. Tex. 2008).  *See also Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d

6    1272, 1282 (Fed. Cir. 2000).

7            The Baliga patent, the Baliga text, and the Ghandhi text each supports the portion of

8    AOS's proposed construction requiring that the field plate modify the depletion layer.  For

9    example, the Baliga text explains how by modifying the depletion layer in the underlying silicon,

10   a field plate reduces an otherwise high concentration of electric field lines and thereby increases

11   breakdown voltage within the termination region:

12   When a positive bias is applied to the metal field plate
     with respect to the *N*-type substrate, it will attract
13   electrons to the surface and cause the depletion layer
     to shrink as illustrated by case A.  If a negative voltage
14   is applied to the field plate, it will drive away electrons
     from the surface, causing the depletion layer to expand
15   as illustrated in case C.  The latter phenomenon can be
     expected to increase the breakdown voltage.
16                      *       *       *

17   The presence of the field plate at the diffusion region
     potential forces the depletion layer to extend at the
18   surface beyond the edge of the field plate.  This
     reduces the depletion layer curvature and reduces the
19   electric field at point A.



20   Baliga text at 116-117.  *See also* Baliga Patent at col. 4:8-9 ("By altering the potential on the field

21   plate, the depletion layer shape can be adjusted."); Ghandhi text at 66 (discussing field plates as

22   "an alternate means for control of the depletion layer edge."); '947 patent at col. 1:31-34.  To be a

23   field plate or to act as a field plate, a structure must increase the device breakdown voltage in the

24   termination region in the same way as a field plate would, i.e., by modifying the depletion layer in

25   the underlying silicon substrate.

26           Fairchild cannot avoid the teaching of the specification by now attempting to distinguish

27   the explanatory texts cited by the inventors, or by relying on the testimony of their expert witness,

28   _____
     [14] Sun Decl. Ex. 19; Sun Decl. Ex. 17; Sun Decl. Ex. 20.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dr. Blanchard.  *See* Fairchild Br., at 20:15-21:1 (citing Blanchard Decl., ¶52).  In any event, Dr.

Blanchard's litigation-inspired description of a field plate is technically incorrect.  *See* Salama

Opp. Decl., ¶¶ 8, 9 (explaining that, to act as a field plate as claimed in the '947 patent, a

conductive ring must modify the depletion layer or depletion region in the underlying

semiconductor material).[15]

2.    **The Court Should Reject Fairchild's Attempt To Define "Same" As Including "Different"**

| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
|---|---|---|
| A plurality of elongated inner runners extending in the same direction. | Multiple substantially parallel gate trenches filled with a conductive material extending in one direction across the active transistor region. | Conductive structures formed in trenches extending in the same direction across the active area of the device. |

As pertinent here, there are two types of power MOSFETs:  "open cell" and "closed cell."

On its face, the '947 patent only covers open cell devices.  Fairchild's proposed construction

would broaden the coverage of the claim to include "closed cell" devices as well.

An open cell MOSFET includes multiple, elongated trenched gates, also known as inner

runners, arranged in a "stripe" pattern.  Salama Opp. Decl. at ¶ 20.  These elongated trenched

gates extend in one and only one direction because they are parallel to each other.  *Id.*  A closed

cell MOSFET includes multiple trenched gates arranged in a "grid" pattern:

Open-Cell Design:     Closed-Cell Design: 

*Id.*  AOS's proposed construction is supported by the use of the term "same" in the claim

language.  In the open cell device depicted above, the trenched gates all run in parallel in a north-

---

[15] Although all of the devices involved in this case are fabricated using silicon, Fairchild objects to the word "silicon" in AOS's proposed construction.  *See* Fairchild Br., at 21:3-8.  AOS would not object to replacing the word "silicon" with the words "semiconductor material" in its proposed construction.  *See* Blanchard Decl. at ¶ 14, 53.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  south direction.  In the closed cell device depicted above, the trenched gates are running in

2  different directions, *i.e.*, perpendicular to one another.

3      Relying exclusively on Dr. Blanchard, Fairchild improperly attempts to construe the term

4  *same* to include gates running in *different* directions:

5      With regard to closed cell designs in particular, the inner runners extend across the
    active area, and are intersected by runners <u>extending in a different direction</u>.  The
6      runners <u>extending in a different direction</u> may or may not extend across the entire
    active area.  But, the fact that there are other runners intersecting the elongated
7      runners does not preclude the elongated inner runners from falling within the
    scope of the claim language.

8  Blanchard Decl. at ¶ 54 (emphasis added).  The terms "same" and "different" are *antonyms*.

9  Absent support in the intrinsic evidence for a unique definition, the disputed claim term "same"

10  cannot be stretched to mean its dictionary opposite, "different."  And Fairchild cites no intrinsic

11  evidence supporting its proposed construction in its Opening Brief. [16]

12          3.    **The Court Should Adopt AOS's Construction Of The Term "Isolation
            Trench" And Reject Fairchild's Proposed Construction; Fairchild's**
13              **Proposed Construction Is Based Principally – And Improperly – On**
            **Extrinsic Evidence From Its Expert Witness.**
14

15
| Disputed Term | AOS's Proposed Construction | Fairchild's Proposed Construction |
16 | --- | --- | --- |
| Isolation trench. | A valley filled with dielectric material surrounded by sidewalls in the periphery of a semiconductor substrate that can prevent leakage into the substrate. | An insulating structure, having a wall near the die edge, which electrically isolates the body region from the die edge. |

20      Claim 1 of the '947 patent is limited to power MOSFETS incorporating an "isolation

21  trench."  AOS's proposed construction is based on the claim language and the specification.

22  Fairchild, on the other hand, proposes a broad construction that is based principally on extrinsic

23  evidence, viz., Dr. Blanchard's discussion of the purported process for manufacturing power

24  MOSFET devices.  *See* Fairchild Br., at 23:1-24:7.  Fairchild wants to broaden the meaning of the

25  term "isolation trench" to include "insulating structures" that are not, in fact, isolation trenches so

26

_____

27  [16] The prosecution history supports a construction that is limited to open cell designs because the
    inventors emphasized during prosecution this was the nature of the claimed invention.  *See* Sun
28  Ex. 24, Dec. 29, 2003 Amendment, at 13:15-14:1 (emphasizing "inner runners extending in the
    same direction.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1   it can claim that AOS devices that do not actually use isolation trenches infringe its patent.

2              a.       **An Isolation Trench Must Actually Be A Trench.**

3         Claim 1 clearly claims an isolation *trench*: ""an isolation trench extending into the

4   semiconductor layer . . . ." '947 patent at col. 6:37-39.  The specification also describes an

5   isolation *trench*: "An isolation trench 72, which may be formed at the same time as the trench 28

6   . . . ." *Id.* at col 4:11-14.

7         Fairchild asks this Court to broaden this limitation term to include any "insulating

8   structure."  The vague term "insulating structure" could encompass many things other than a

9   trench filled with dielectric material.  *See* Salama Opp. Decl. at ¶ 16.  Fairchild's proposal is

10  inconsistent with the claim language and specification of the patent, and should be rejected.

11             b.       **An Isolation Trench – Like Any Other Trench - Must Have**

12                      **Two Sidewalls.**

      AOS's proposed construction requires that the isolation trench have two sidewalls,

13  whereas Fairchild proposes that a trench may have a single sidewall. AOS's construction is based

14  on the plain meaning of the term "trench" and is supported firmly by the specification.

15        The word "trench" is a common term, well understood by lay persons and experts alike to

16  mean a long, narrow, and deep depression, with two sidewalls.  *See, e.g.,* Sun Decl., Ex. 21,

17  McGraw-Hill Dictionary of Scientific and Technical Terms (5th ed. 1994) at 2065 (defining

18  trench as "a narrow, straight, elongate, U-shaped valley between two mountain ranges"); Sun

19  Decl. Ex. 22, Merriam Webster's Collegiate Dictionary (10th ed. 1997) at 1259 (defining trench

20  as "a long, narrow, and usually steep-sided depression in the ocean floor").  If a structure had

21  only one wall, it would be a wall or a step, not a trench.  *See* Salama Opp. Decl., ¶ 17.

22        The specification comports with the plain meaning of the term.  *First*, the specification

23  uses the term to identify a number of depressions each having two sidewalls.  Figure 1 of the '947

24  patent shows three trenches 72, 58, and 28, each having two sidewalls:

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIG. 1

The specification describes "[a]n isolation trench 72, which may be formed at the same time as the trench 28." '947 patent at col. 4:12-14. Both of these structures have two walls. Indeed, throughout the specification *every* structure described as a trench has two sidewalls.

*Second*, Claim 1 requires that the isolation trench be "positioned <u>between</u> the edge of the device and the second conductor portion*." Id.* at col. 6:37-38. The specification defines the surface region 52 to be the "die edge." *See id.* at col. 3:51-52 ("the outer periphery 52, i.e., the die edge."). As can be seen in Figure 1 of the '947 patent, above, the surface region 52 is not the physical boundary of the substrate, rather it is the part of upper surface of the substrate that extends horizontally away from the <u>outer sidewall</u> of the isolation trench 72 to the physical boundary of the substrate. *See id.* at Fig. 1. The upper surface 18 extends horizontally away from the <u>inner sidewall</u> of the isolation trench 72 to the outer sidewall of the gate runner trench 58 (not shown in this figure). *See id.*

Fairchild's proposed construction – a single-walled structure – is defeated by this intrinsic evidence. To support its proposed construction, Fairchild turns once again to Dr. Blanchard, who says that the term "isolation trench" must include single-walled structures because "[o]ften, isolation trenches are formed between adjacent devices on a wafer, and the singulation step cuts through the isolation region to form separate devices. Thus, one wall of the isolation trench is located on one device, and the other wall is located on another device." Blanchard Decl., ¶55; *see also* Fairchild Br., at 23:16-28 (challenging AOS's proposed definition based exclusively on this portion of the Blanchard Declaration).

Unfortunately for Fairchild, nothing in the patent supports a claim covering this type of halved isolation trench. Dr. Blanchard's purported description of the manufacturing process

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24
1-PA/3697212.1

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)

1  cannot broaden the scope of the claim beyond the claim language and the specification. *Phillips*,

2  415 F.3d at 1318 ("a court should discount any expert testimony that is clearly at odds with the

3  claim construction mandated by the claims themselves, the written description, and the

4  prosecution history") (citation omitted)**.**  In truth, semiconductor device manufacturers do not cut

5  through isolation trenches for at least two reasons. *First*, silicon is softer and thus easier to cut

6  than the oxide in the isolation trenches. *See* Salama Opp. Decl. at ¶ 19. *Second*, MOSFETs are

7  cut from each other using high speed diamond saws approximately 75 to 250 microns wide,

8  whereas a typical isolation trench is only about 1-3 microns wide.[17] *Id.*  The trench would have to

9  be made significantly wider than the saw itself in order not to be destroyed by the cutting process.

10  *See id.*

11       Finally, Fairchild takes issue with the portion of AOS's proposed construction that

12  describes the purpose of an isolation trench:  to "prevent leakage into the substrate." *See*

13  Fairchild Br., at 24:1-7.  Although the patent does not provide much elaboration on the purpose of

14  the isolation trench, this portion of AOS's proposed definition is consistent with the

15  understanding of a person of ordinary skill in the art. *See* Salama Opp., Decl., at ¶ 16.

16  **IV.    CONCLUSION**

17       The Court should adopt AOS's proposed constructions for disputed terms. AOS's

18  proposed constructions are all firmly based on the intrinsic evidence.  Fairchild's attempt to

19  broaden its asserted claims relying principally on its expert's declaration should be rejected.

20  Dated: March 27, 2008                    MORGAN, LEWIS & BOCKIUS LLP

21

22                                          By    /s/ Daniel Johnson, Jr.

23                                              Daniel Johnson, Jr.

24                                          Attorneys for Plaintiffs and
                                            Counterdefendants
25                                          ALPHA & OMEGA SEMICONDUCTOR,
                                            LTD. AND ALPHA & OMEGA
26                                          SEMICONDUCTOR, INC.

27

28

---

[17] The distance from the die edge periphery 52 to the first active trench 28 is only about 20 to 120 microns.  '947 patent at col. 5:40-45.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

AOS'S OPPOSITION CLAIM CONSTRUCTION BRIEF
PURSUANT TO PATENT L.R. 4-5
(C 07-2638 JSW)